UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

HERSIE R. WESSON,                    )
                                     )    CASE NO.  5:14 CV 2688
            Petitioner,              )
                                     )
     v.                              )    JUDGE DAN AARON POLSTER
                                     )
CHARLOTTE JENKINS, Warden            )
                                     )    **MEMORANDUM OF OPINION**
            Respondent.              )    **AND ORDER**


## INTRODUCTION

Petitioner Hersie Wesson was convicted and sentenced to death in an Ohio state court for

the aggravated murder of 81-year-old Emil Varhola.  Wesson has now filed a petition and

amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the

constitutionality of his convictions and sentence.  (Docs. 16, 36.)  Respondent Warden Charlotte

Jenkins has filed a return of writ to the amended petition.  (Doc. 43.)[1]  Wesson has filed a

traverse.  (Doc. 46.)  For the reasons stated below, the Court reserves judgment on Wesson's

claims under *Atkins v. Virginia*, 536 U.S. 304 (2002), until after the parties have presented

evidence at a hearing, and denies Wesson's amended petition as to all remaining claims.

_____

[1] According to the parties' filings, Tim Shoop, not Charlotte Jenkins, is the
current Warden of Chillicothe Correctional Institution, where Wesson is incarcerated.
For consistency with the docket, however, the Court continues to list Charlotte Jenkins as
the respondent.

**FACTUAL HISTORY**

The Ohio Supreme Court set forth the following facts underlying Wesson's convictions:

On February 25, 2008, Wesson's girlfriend, Mildrian Ford, filed a police report against him following a dispute. Because Wesson was serving a three-year term of postrelease control following his release from prison in 2007, Ford also notified his parole officer, Julie Clark, of the incident. Clark, together with another parole officer and members of Akron's fugitive task force, began searching for Wesson.

That evening, Wesson went to the home of 81–year–old Emil Varhola and his 77–year–old wife, Mary, who lived near Ford and knew Wesson from the neighborhood. Wesson sometimes talked to Emil, who occasionally gave him money or hired him to do odd jobs. Wesson knocked on their door and asked if he could come inside while he waited for Ford's bus to arrive, and they accommodated him. Emil, who used a portable oxygen tank to breathe, offered Wesson coffee, and the two sat together at the kitchen table. Mary returned to the living room.

Mary then heard a whistling sound coming from the kitchen. When she returned to the kitchen, she saw Emil lying on the floor in a pool of blood with the whistling sound coming from his windpipe and Wesson rifling through Emil's pockets. Mary confronted him, and he admitted that he killed Emil, and then he attacked her. He demanded "the gun," explaining that he needed it to kill his girlfriend. Mary refused to tell him where Emil kept his handgun, even as Wesson beat and stabbed her. According to Mary, he stopped assaulting her only when he thought she was dead.

Wesson fled the home, taking a rifle and the cup from which he had drunk and throwing them in a bush in the front yard. He also took Mary's jewelry and Emil's wallet containing approximately $800.

When he left, Mary contacted her son, Paul, who called 9–1–1 to report the incident. When officers arrived, they found Emil dead in the kitchen and Mary hardly able to stand or speak, but she was able to show police where Emil kept his pistol, in a hollowed-out book in the living room. She had multiple stab wounds on her chest and upper abdomen, bruises, and lacerations on her hands and fingers. Her right cheek had a large gash in it with the skin peeled back, exposing bone. Emergency personnel transported Mary to the hospital, where she lost consciousness and remained unconscious and on a respirator for more than a month before awaking.

Officers found blood pooled on the kitchen floor, splattered on the curtains, smeared on the refrigerator, and splashed on the dining room wall and carpet. They noted other signs of a struggle, including objects strewn about and a set of dentures on the floor. The gun cabinet stood open, and one long gun appeared to be missing. Investigators did not find any weapon near Emil's body.

2

Police followed a trail of bloody footprints leading to a bush in the front yard of the home, where they discovered Emil's long gun and the cup. They subsequently located Emil's wallet—which had no money in it—under the porch of a home several blocks away.

Based on Mary's statements, the police began to look for Wesson. With Ford's assistance, officers located him at the Akron home of Christopher Conley, his cousin, in the early morning hours of February 26, 2008. On a dresser in the room where the police found Wesson, they discovered a straight-edged steak knife with what appeared to be dried blood on it. When they arrested Wesson, they observed blood-soaked bandages on his hands and what appeared to be blood on his sneakers and on his pants and on a jacket found in the room.

At the police station, Wesson waived his Miranda rights, and two detectives interviewed him. He admitted stabbing Emil and Mary, but claimed that he acted in self-defense. He related that he and Mary had an ongoing sexual relationship and that Emil usually watched, but on this occasion he became upset watching them have unprotected sex on the kitchen floor. According to Wesson, Emil threatened him with a long gun and attacked him with a knife, but Wesson was able to disarm and stab Emil. Then, he claimed, he stabbed Mary after she hit him on the head with her cane. Based on Wesson's assertion that he had engaged in intercourse with Mary, investigators had the hospital perform a rape-kit examination on her, but samples tested negative for semen.

An autopsy revealed that Emil had been stabbed eight times—four times in the torso, once in the neck, and three times in the back—and it revealed defensive wounds on his hands. Dorothy Dean, a deputy medical examiner for the Summit County Medical Examiner's Office, concluded that the stab wounds in Emil's neck and torso caused his death, and she testified that Emil's injuries could have been caused by the knife seized at the time of Wesson's arrest.

\* \* \*

At trial, the state argued that Wesson came to the Varholas' home looking for a gun to kill his girlfriend and then murdered Emil and attempted to murder Mary. In contrast, the defense presented a theory of a friendly encounter that turned bad, stating that the Varholas had invited Wesson into their home so he would not have to wait for a bus in the cold, but that Emil began to behave erratically, and Wesson, who knew that Emil owned guns, thought Emil had threatened him. Thus, the defense asserted that Wesson stabbed Emil in self-defense and assaulted Mary only when she attacked him with her cane.

\* \* \*

In Wesson's case-in-chief, the defense called a single witness, Akron Police Detective Joseph Urbank, who testified that he had interviewed a woman named Linda Fields about her observations of Wesson on February 25, the date of the murder. Fields died before trial, and by agreement of the parties, the defense played an audio recording of Urbank's interview with her. On the recording, she claimed that Wesson was at his cousin's residence, where she had been staying, from 5:00 p.m. until 8:00 p.m. on February 25. He left around 8:00 p.m. and did not return until 10:00 p.m. At that time, he had fresh cuts on his hands and she gave him bandages for the cuts. Fields also told Urbank that she had left the knife on the bedroom dresser earlier that afternoon.

*State v. Wesson*, 137 Ohio St. 3d 309, 310-12 (Ohio 2013).

**PROCEDURAL HISTORY**

**A.      State-Court Proceedings**

**1.      Trial Court**

The Summit County Grand Jury indicted Wesson on March 13, 2008, for three counts of aggravated murder, including aggravated murder with prior calculation and design (Count One); aggravated murder while committing aggravated robbery (Count Two); and aggravated murder while under detention (Count Three).  (Doc. 12-1 at 30-33.)[2]  Each count carried three capital specifications:  aggravated murder while under detention; aggravated murder as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender"; and aggravated murder while committing aggravated robbery.  (*Id*. at 33-34.)  The indictment also charged Wesson with three counts of attempted aggravated murder (Counts Four through Six), two counts of aggravated robbery (Counts Seven and Eight), one count of having weapons while under a disability (Count Nine), and one count of tampering with evidence

_____

[2] All references to page numbers of documents in the Court's electronic court filing system ("ECF") are to the page numbers of the individual ECF documents, not to the original documents' page numbers or ECF "PageID" numbers.

(Count Ten).  (*Id.* at 34-37.)  The grand jury issued a supplemental indictment on May 5, 2008, charging Wesson with two counts of attempted murder (Counts Eleven and Twelve) and one count of aggravated robbery (Count Thirteen).  (Doc. 12-3 at 45-46.)  Wesson entered pleas of not guilty to all charges.  (Doc. 12-1 at 45; Doc. 12-4 at 5.)

The trial court appointed Lawrence Whitney and Walter Benson as Wesson's trial counsel.  (Doc. 12-1 at 44.)  At Wesson's request, the court later appointed a third attorney, Tyler Whitney, to represent Wesson.  (*Id.* at 80.)  Walter Benson later withdrew from the case and the court appointed Donald Hicks to replace him.  (Doc. 12-3 at 101.)  The court also later granted Wesson's request for the appointment of two experts, psychologist Jeffrey Smalldon, Ph.D., and mitigation specialist Thomas Hrdy.  (*Id.* at 123.)

On April 2, 2008, Wesson moved to suppress or limit the introduction of statements he made to police upon his arrest, on the grounds that the police failed to give him proper *Miranda* warnings, his *Miranda* waiver was involuntary because he was highly intoxicated, and the police had coerced the statements.  (Doc. 12-1 at 72-78.)  Wesson also moved to exclude the statements he made to police as impermissible hearsay evidence.  (*Id.* at 84-87.)  After conducting a hearing on the matter, the trial court denied Wesson's motion to suppress, finding that he knowingly, intelligently, and voluntarily waived his *Miranda* rights, and that his statement to police was voluntarily made.  (Doc. 12-4 at 66-79.)  The court also denied Wesson's motion in limine regarding the statements.  (*Id.* at 64-65.)

On November 21, 2008, Wesson filed a notice that he "repudiate[d]" the statements he made to police the day of his arrest.  (Doc. 12-5 at 20-21.)  On January 7, 2009, the State filed a motion in limine to exclude an audio recording that Wesson made retracting his statements to

police. (Doc. 12-6 at 22-24.) The trial court granted the State's motion and excluded the recording as hearsay. (*Id*. at 63.)

On January 6, 2009, Wesson waived his right to a trial by jury, and elected to be tried by a three-judge panel, including the presiding judge and two other judges chosen by the chief judge. (*Id*. at 11-13.) The next day, Wesson signed an amended waiver of trial by jury, which stated that the two additional judges were "to be designated pursuant to law." (*Id*. at 14-15.) The court explained in an order issued that day that Ohio law provides that the two additional judges could be designated by the presiding judge or chief justice of that court. (*Id*. at 47-48.) The court further noted that Wesson, his counsel, and the State agreed to the amendment of the waiver. (*Id*. at 48.) On January 12, 2009, the trial-court judge selected the other two judges for the three-judge panel, which Wesson's counsel approved. (*Id*. at 94.)

On January 8, 2009, the State dismissed three counts of attempted aggravated murder (Counts Four through Six) and one count of aggravated robbery (Count Eight). (*Id*.)

Wesson's trial commenced on January 15, 2009. (*Id*.) At the close of the State's case, the trial court granted Wesson's motion to dismiss one count of aggravated murder with prior calculation and design (Count One) and its specifications. (*Id*.) On January 23, 2009, the panel found Wesson guilty of all remaining charges. (*Id*.)

On March 3, 2009, upon Wesson's motion, the panel ordered the merger of Counts Two and Three, both of which involved the aggravated murder of the same victim, Emil Varhola. (*Id*. at 109-15.) The State elected to have Wesson sentenced for Count Two, aggravated murder while committing aggravated robbery, and the three specifications attached to that count. (*Id*. at 123.)

6

The sentencing phase of the Wesson's trial was held on March 6, 2009, before the same three-judge panel as the guilt phase. (*Id*.) On March 13, 2009, the panel imposed a sentence of death for the remaining count of aggravated murder of Emil Varhola. (*Id*.) It further imposed consecutive sentences totaling twenty-six years' imprisonment for the remaining, noncapital offenses.[3] (*Id*. at 123-24; Doc. 12-7 at 1-16.)

### 2. Direct Appeal

Wesson filed a timely appeal to the Supreme Court of Ohio on April 22, 2009. (Doc. 12-7 at 48-49.) He was represented by new counsel, David Doughten and George Pappas. (*See id*.) In his merit brief, Wesson raised the following propositions of law, stated as:

1. An indictment which fails to set forth each and every element of the charged offense, including the mens rea, is in violation of the Due Process Clause of both the State and Federal Constitution[s].

2. Where a defendant is found guilty for having committed an offense while under postrelease control, the conviction is invalid where the sentencing entry placing the defendant on postrelease control failed to follow the mandates of [Ohio Rev. Code] § 2967.28(B).

---

[3] Specifically, the panel imposed a mandatory prison term of nine years for aggravated robbery, as contained in Count Seven, with a period of five years' mandatory post-release control; four years' imprisonment for having weapons while under disability, as contained in Count Nine, with an undetermined period of post-release control; four years' imprisonment for tampering with evidence, as contained in Count Ten, with an undetermined period of post-release control; and a mandatory prison term of nine years' imprisonment for attempted murder, as contained in Count Eleven, with a period of five years mandatory post-release control. (Doc. 12-6 at 124-25.) The panel merged the attempted murder charge in Count Twelve with the attempted murder charge in Count 11, and the aggravated robbery charge in Count Thirteen with the aggravated robbery charge in Count Seven. (*Id*.) It further ordered that the sentences imposed in Counts Seven, Nine, Ten, and Eleven were to be served concurrently. (*Id*. at 125.)

3.      Where a defendants [*sic*] right to present a defense is arbitrarily infringed by a state rule of evidence, the former prevails. Therefore, a trial court must preclude essential defense evidence based solely on state rules of evidence.

4.      When a capital defendant waives his right to a jury trial, [Ohio Rev. Code] § 2945.06 requires that the presiding judge of the court rather than the case itself select the other members of a three[-]judge panel to hear and decide a capital murder trial.

5.      Where the presumption against the waiver of Miranda protections is not overcome by the totality of the circumstances of the waiver, any resultant statement by a defendant must be suppressed.

6.      Tampering with Evidence, [Ohio Rev. Code] § 2921.12[,] and Aggravated Robbery, [Ohio Rev. Code] § 2911.01[,] are allied offenses pursuant to [Ohio Rev. Code] § 2945.21 where the underlying theft offense and the making the element unavailable constitute the same animus.

7.      Victim-impact statements made by or on behalf of family members of the decedent at the time of sentencing are limited in nature and may not address the families [*sic*] characterization of and opinions about the crime, the defendant and the appropriate sentence.

8.      The failure to raise and preserve meritorious issues during the culpability phase results in the denial of a defendant's right to effective assistance of counsel.

9.      The death penalty may not be sustained where the cumulative errors that occurred in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.

10.      [Ohio Rev. Code] § 2929.04(A)(7) is unconstitutional where the same acts which constitute the charge of aggravated murder are also used to narrow the class of death[-]eligible defendants.

11.      The death penalty cannot be upheld where the reviewing court fails to follow the statutory provisions regarding the proportionality review of the defendant's sentence.

12.      The death penalty is unconstitutional as presently administered in Ohio.

(Doc. 12-8 at 26-32.)

On October 23, 2013, the Ohio Supreme Court reversed the convictions for Count Three, the specifications related to that count, and Specification One related to Count Two, because the original sentencing entry that imposed post-release control on Wesson placing him under detention was void. *Wesson*, 137 Ohio St. 3d at 309-10. The court affirmed the remaining convictions, including the aggravated murder conviction contained in Count Two and its death penalty specification, the imposition of the death sentence, and the aggregate sentence of twenty-six years' imprisonment for the noncapital offenses. *Id*. at 310. Wesson moved for reconsideration of the court's judgment, which the court denied on December 24, 2013. (Doc. 12-8 at 285-86, 291); *State v. Wesson*, 137 Ohio St. 3d 1444 (Ohio 2013).

On March 24, 2014, Wesson filed a petition for a writ of certiorari in the United States Supreme Court, presenting the following question for review, stated as:

> In a weighing state, and pursuant to *Brown v. Sanders*, 546 U.S. 212 (2006), when a state supreme court invalidates a sentencing eligibility factor, a subsequent death sentence will be rendered unconstitutional unless one of the other sentencing factors permits the sentence to give aggravating weight to the same facts and circumstances supporting the invalid aggravator.

(*Id*. at 323; Doc. 16 at 17.) The Court declined jurisdiction on May 19, 2014. (Doc. 12-8 at 331); *Wesson v. Ohio*, 134 S. Ct. 2311 (2014).

### 3. First Post-Conviction Proceedings

Wesson also appealed his conviction and sentence through state post-conviction proceedings, pursuant to Ohio Revised Code § 2953.21. He was represented by new counsel, Jennifer Prillo and Benjamin Zober of the Ohio Public Defender's Office. (*See* Doc. 12-9 at 194.) On February 17, 2010, he filed a post-conviction petition in the trial court, which raised eleven grounds for relief, presented as follows:

9

1.  Petitioner's sentences are void or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the [U.S. Const. art.] I, §§ 1, 2, 5, 9, 10, 16 and [Ohio Const. art. 20]. As a result, Petitioner was prejudiced.

2.  Petitioner's sentences are void or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution. As a result, Petitioner was prejudiced.

3.  Petitioner's sentences are void or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution. As a result, Petitioner was prejudiced.

4.  Petitioner's death sentence is void or voidable because he received ineffective assistance of counsel during the mitigation phase of his capital trial. The psychologist who testified for the defense was inadequate and did not explain for the jury how this crime could have occurred. Petitioner's right to due process, a fair trial and the effective assistance of counsel as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution, and Sections 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution were violated.

5.  Petitioner's sentence is void or voidable because his trial counsel failed to present mitigating evidence regarding his brother Wayne Wesson's criminal record. This inaction violated Wesson's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

6.  Petitioner's sentence is void or voidable because his trial counsel failed to present mitigating evidence from his cousin, Herb Wesson. This inaction violated Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

7.  Petitioner's sentence is void because his trial counsel failed to present mitigating evidence. This inaction violated Wesson's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

8.     Petitioner's conviction and death sentence are void or voidable because he received, and was prejudiced by, ineffective assistance of his trial counsel. Trial counsel were ineffective because they failed to sufficiently impeach the credibility of one of the State's key witnesses, Mary Varhola. Such impeachment would have cast reasonable doubt on the State's case. Trial counsel's failure resulted in Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution being violated. *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Johnson*, 24 Ohio St. 3d 87 (1986).

9.     Petitioner's sentence is void or voidable because the three-judge panel was improperly assembled. This inaction violated Wesson's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

10.     Petitioner's sentence is void or voidable because his counsel was ineffective for failing to object to the improperly assembled three-judge panel. This violated Wesson's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

11.     Petitioner's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his postconviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights secured by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

(Doc. 12-9 at 155-94.) On February 17, 2010, Wesson filed an amendment to his petition adding the following twelfth ground for relief:

12.     Petitioner's convictions and sentences are void or voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

(Doc. 12-14 at 192-93.)

The trial court denied Wesson's post-conviction petition on March 2, 2011. (*Id.* at 284-99.)

Wesson, still represented by Attorney Prillo of the Ohio Public Defender's Office and by additional counsel Kelle Hinderer of that office, appealed the trial court's denial of his post-conviction petition on April 1, 2011. *(Id.* at 301-02.)  In his appellate brief, he presented the following three assignments of error:

> 1.      The trial court erred by dismissing Appellant's post-conviction petition, where he presented sufficient operative facts and supporting exhibits to merit at minimum an evidentiary hearing and discovery.
>
> 2.      The trial court erred in dismissing Appellant's post-conviction petition without holding an evidentiary hearing and affording him the opportunity to conduct discovery.
>
> 3.      Considered together, the cumulative errors set forth in Appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

(Doc. 12-15 at 126 (capitalization altered).)  The Summit County Court of Appeals affirmed the trial court's decision on September 28, 2012.  *State v. Wesson*, No. 25874, 2012 WL 4480109 (Ohio Ct. App. Sept. 28, 2012).

Wesson then appealed that judgment to the Ohio Supreme Court on November 9, 2012. (Doc. 12-16 at 3-5.)  In his memorandum in support of jurisdiction, he set forth three propositions of law, stated as follows:

> 1.      When a petitioner presents sufficient operative facts in his post-conviction petition, he is entitled to relief or, at a minimum, an evidentiary hearing on his grounds for relief.
>
> 2.      A trial court must provide a post-conviction petitioner with the opportunity to conduct discovery pursuant to the rules of civil procedure.  U.S. CONST. amend. XIV.

3.      In a proper post-conviction process, errors must be considered cumulatively. U.S. CONST. amend. XIV.

(*Id*. at 6-7.)  The court declined jurisdiction and dismissed the appeal on September 24, 2014.

*State v. Wesson*, 140 Ohio St. 3d 1438 (Ohio 2014).

### 4.      Application to Reopen Direct Appeal

Meanwhile, on March 21, 2014, Wesson filed an application to reopen his direct appeal

in the Ohio Supreme Court, pursuant to Ohio Supreme Court Practice Rule 11.06.  (Doc. 12-8 at

305-16.)  He was represented by new counsel, Angela Wilson Miller.  (*See id.* at 315.)  In his

application, he asserted that his appellate counsel failed to raise the following claims:

1.      A defendant is denied the right to the effective assistance of counsel when trial counsel prejudicially fails his client during his capital trial. U.S. CONST. [a]mends. V, VI, XIV; OHIO CONST. [a]rt. I, §§ 2, 9, 10 and 16.

2.      Hersie Wesson is mentally ill.  His death sentence is in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution.

3.      A trial court violates a capital defendant's constitutional rights to a fair trial and due process when it fails to record sidebars and comply with its own rulings to ensure a complete record on appeal. U.S. CONST. [a]mends. V, VI, VIII and XIV; OHIO CONST. [a]rt. I, §§ 1, 2, 5, 9, 10, 16 and 20.

(*Id*. at 307, 313, 315.)  The court denied the application on October 8, 2014.  *State v. Wesson*,

140 Ohio St. 3d 1449 (Ohio 2014).

### B.      Initial Federal Habeas Corpus Proceedings

On December 9, 2014, Wesson initiated habeas corpus proceedings in this Court by filing

a notice of intent to file a petition for writ of habeas corpus.  (Doc. 1.)  That same day, he also

filed a  motion for appointment of counsel and motion to proceed *in forma pauperis*.  (Docs. 2,

3.) The Court granted the motion for appointment of counsel, appointing Joseph Wilhelm and Vicki Werneke of the Office of the Federal Public Defender and Rachel Troutman and Shawn Welch of the Office of the Ohio Public Defender, on January 23, 2015, and the motion to proceed *in forma pauperis*, on January 26, 2015.

After requesting and receiving an extension of time, Wesson filed a petition for writ of habeas corpus on September 24, 2015, asserting six claims for relief. (Doc. 16. )

On October 22, 2015, Wesson moved to stay his case in this Court and hold it in abeyance until he has exhausted his claim in state court that he is intellectually disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 20.) Respondent opposed the motion on November 5, 2015. (Doc. 22.) On November 20, 2015, this Court granted Wesson's motion to stay the case and hold it in abeyance. (Doc. 25.)

### C.   Second State-Court Post-Conviction Proceedings

On December 11, 2015, Wesson, now represented by Shawn Welch, Rachel Troutman, and Jessica Carrico of the Ohio Public Defender's Office,  filed a second-in-time post-conviction petition in the state trial court. (Doc. 41-1 at 13-85.) He raised sixteen grounds for relief, stated as follows:

1.   Hersie Wesson is intellectually disabled. Therefore his death sentence is unconstitutional.

2.   Trial counsel rendered prejudicially deficient performance by failing to raise and litigate Wesson's intellectual disability.

3.   Wesson was prejudiced by trial counsel's failure to investigate and present evidence of Wesson's Fetal Alcohol Spectrum Disorders (FASD) effects.

4.   Hersie Wesson was prejudiced by his attorneys' false advice regarding whether he was able to withdraw his jury waiver.

14

5.    Wesson was prejudiced by trial counsel's failure to properly advise him regarding the State's plea offer.

6.    Wesson was prejudiced by trial counsel's failure to investigate and present evidence regarding Emil Varhola's known aggressive behavior.

7.    Trial counsel rendered prejudicially deficient performance in the culpability phase of Hersie Wesson's capital trial.

8.    Wesson was prejudiced by trial counsel's failure to investigate and present evidence regarding Mimi Ford and her relationship with Wesson.

9.    Wesson was prejudiced by trial counsel's failure to investigate and present documented evidence from Wesson's treatment at the Community Health Center.

10.   Wesson's trial counsel failed to present evidence of his history and family background during the penalty phase of his capital trial.

11.   Wesson's trial counsel failed to present evidence of his history and family background during the penalty phase of his capital trial.

12.   Wesson's trial counsel failed to present evidence of his history and family background during the penalty phase of his capital trial.

13.   The cumulative effect of Wesson's counsel's ineffectiveness violated Wesson's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution . . . .

14.   Wesson was denied his constitutional right to effective assistance of counsel when his trial counsel failed to investigate and present available evidence of Wesson's character, history, and family background during the penalty phase of his capital trial in violation of his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

15.   Wesson's statutory rights under O.R.C. § 2953.21 were squandered through no fault of his own.  His former attorneys violated his right to present evidence of constitutional violations in a timely, competent, and effective fashion, and they failed to file significant post-conviction claims within the time frame denoted in O.R.C. § 2953.21(A)(2).

16. The cumulative effect of Hersie Wesson's counsel's ineffectiveness violated Wesson's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution[.]

(*See id*. at 31, 41, 44, 50, 53, 56, 58, 65, 68, 70, 72, 74, 77, 78, 79, 82.)

The state court denied the petition on the grounds that it was successive and untimely under Ohio's statutory post-conviction relief scheme. (Doc. 41-3 at 106-17.)

Wesson appealed that judgment to the state court of appeals. (*Id*. at 118-19.) In his appellate brief, he raised the following assignments of error, stated as:

1. The trial court erred when it adjudicated Wesson's Petition for Post-conviction Relief under the more stringent standards of Ohio Revised Code § 2953.23, as opposed to § 2953.21.

2. The trial court erred when it failed to consider Wesson's claims of ineffective assistance.

3. The trial court erred when it placed the burden of thoroughly investigating an *Atkins* claim on a petitioner with an intellectual disability claim.

4. The trial court erred in dismissing Wesson's Post-conviction Petition when he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing.

(Doc. 41-4 at 98-99.) The state appellate court affirmed the trial court's judgment. *State v. Wesson*, No. 28412, 2018 WL 1189383 (Ohio Ct. App. March 7, 2018).

Wesson appealed to the Ohio Supreme Court. (Doc. 41-5 at 92-93.) In his memorandum in support of jurisdiction, he presented four propositions of law, stated as follows:

1. A petitioner's post-conviction claims filed outside the 180-day window should still be adjudicated under [Ohio Rev. Code] § 2953.21 rather than [Ohio Rev. Code] § 2953.23 when it was petitioner's counsel's ineffectiveness that prevented the timely filing.

2. The trial court abused its discretion in not considering claims of ineffective assistance of counsel when that ineffective assistance of counsel was why the

16

> petitioner was unavoidably prevented from discovering the evidence on which his claims were based.

3.  The responsibility for thoroughly investigating an Atkins claim should not be placed on the petitioner himself when he is represented by and relying on counsel.

4.  When a petitioner has presented sufficient evidence to support claims of constitutional error during capital proceedings, the trial court must grant relief, or at a minimum, an evidentiary hearing.

(Doc. 41-5 at 97.)  The Ohio Supreme Court declined further post-conviction review on July 5, 2018.  *State v. Wesson*, 153 Ohio St. 3d 1433 (2018).

Wesson appealed that decision to the United States Supreme Court, which denied his petition for writ of *certiorari* on December 10, 2018.  *Wesson v. Ohio*, 139 S. Ct. 644 (2018).

**D.  Reinstated Federal Habeas Corpus Proceedings**

Wesson then returned to this Court and filed an amended habeas petition on January 9, 2019.  (Doc. 35.)  In it, he reasserts his original six grounds for relief, including the now-exhausted claims of ineffective assistance of trial counsel (*id*. at 60-115) and *Atkins* claim (*id*. at 115-23).  Respondent filed a return of writ on May 24, 2019 (Doc. 43), and Wesson filed a traverse on September 23, 2019 (Doc. 46).

Wesson also has moved for an evidentiary hearing on the issue of the procedural default of  several of his claims of ineffective assistance of trial counsel.  (Doc. 47.)  He alleges for those claims that counsel performed deficiently by failing to:  (1) assert that he is intellectually disabled and therefore ineligible for execution under *Atkins*; (2) present evidence of his cognitive and emotional limitations and history and background as mitigating factors at trial, most notably concerning fetal alcohol spectrum disorder; (3) properly advise him about waiving a jury trial and accepting a plea offer to avoid the death penalty; and (4) effectively cross-examine the

17

State's only eyewitness to the murder, Mary Varhola. (*See id.* at 13-14.) Wesson seeks to present evidence demonstrating that the procedural default of these claims should be excused, either for cause – namely, that his initial post-conviction counsel's failure to raise the claims – or because there will be a "fundamental miscarriage of justice" if not considered. (*Id.* at 3-4.) Respondent has filed a brief in opposition (Doc. 48), to which Wesson has replied (Doc. 49). The Court will address that motion in this opinion.

## PETITIONER'S GROUNDS FOR RELIEF

Wesson asserts six grounds for relief in his amended petition, stated as:

1.  Hersie Wesson's right against self-incrimination was violated because he did not knowingly, intelligently or voluntarily waive his right to silence. The illegally obtained statement was used against the Petitioner at his trial, and the statement was important to the State's case against the Petitioner. U.S. CONST. amend[s. V, XIV].

2.  Trial counsel rendered ineffective assistance in the culpability phase of Wesson's capital trial, violating his rights under the Sixth and Fourteenth Amendments. U.S. CONST. amend[s. VI, XIV].

3.  Trial counsel rendered ineffective assistance in the mitigation phase when they failed to investigate and present relevant mitigation evidence of Hersie Wesson's history, background, and character, including his ability to adapt to prison life and his fetal alcohol spectrum disorder, and when counsel allowed Hersie Wesson to make a rambling unsworn statement and "respond" to witnesses' victim impact statements. U.S. CONST. [a]mends. [VI, XIV].

4.  Hersie Wesson's intellectual disability categorically excludes his execution under the Eighth Amendment. U.S. CONST. [a]mends. [V, VI, VIII, XIV].

5.  Hersie Wesson's right to due process was violated by the ineffective assistance of counsel in Wesson's direct appeal to the Supreme Court of Ohio. U.S. CONST. amend[s. XIV].

6.  The death penalty on its face and as applied to Hersie Wesson is arbitrary, cruel and unusual, and it violates due process. U.S. CONST. amend[s. VIII, XIV].

(Doc. 36 at 43, 60, 89, 115, 124, 128.)

STANDARD OF REVIEW

**A.    AEDPA Review**

Wesson's petition for writ of habeas corpus is governed by the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336

(1997) (AEDPA governs federal habeas petitions filed after Act's effective date).  AEDPA,

which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and

federal criminal sentences, particularly in capital cases, and 'to further the principles of comity,

finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael)*

*Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of

our federal system:  State courts are adequate forums for the vindication of federal rights."  *Burt*

*v. Titlow*, 571 U.S. 12, 18 (2013).  It therefore "erects a formidable barrier to federal habeas

relief for prisoners whose claims have been adjudicated in state court."  *Id*. at 19.

One of AEDPA's most significant limitations on the federal courts' authority to issue

writs of habeas corpus is found in § 2254(d).  That provision forbids a federal court from

granting habeas relief with respect to a "claim that was adjudicated on the merits in State court

proceedings" unless the state-court decision either:

(1)    resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

19

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[4] The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a

---

[4] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington,* 562 U.S. at 102-03 (internal quotation marks omitted).  A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges:  "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.*  "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El,* 537 U.S. at 340.  Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.)).  Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).  They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

**B.     Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition."  *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile."  *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to either:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available.  *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claim because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v.*

*Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state

courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate,

a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts

at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[5]

A petitioner also may procedurally default a claim by failing to raise the claim in state

court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of

the federal habeas petition, state law no longer allows the petitioner to raise the claim.  *Williams*,

460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp.

2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts]

cannot be considered in a federal habeas corpus petition.").  Under these circumstances, while

the exhaustion requirement is technically satisfied because there are no longer any state-court

---

[5] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established
the now familiar test to be followed when the state argues that a habeas claim is defaulted
because of a prisoner's failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule
> that is applicable to the petitioner's claim and whether the petitioner failed
> to comply with that rule.  Second, the federal court must determine whether
> the state courts actually enforced the state procedural sanction – that is,
> whether the state courts actually based their decisions on the procedural rule.
> Third, the federal court must decide whether the state procedural rule is an
> adequate and independent state ground on which the state can rely to
> foreclose federal review of a federal constitutional claim.  Fourth, if the
> federal court answers the first three questions in the affirmative, it would not
> review the petitioner's procedurally defaulted claim unless the petitioner can
> show cause for not following the procedural rule and that failure to review
> the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138)
(further citations omitted).

remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court again looks to the last state court rendering a reasoned opinion on that claim. *Ylst,* 501 U.S. at 805. If the state court "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted.[6] *Harris v. Reed*, 489 U.S. 255, 263 (1989). Conversely, if the last state court presented with the

---

[6] Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id.* at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

claim reaches its merits, then the procedural bar is removed and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

**ANALYSIS**

I.     **First Ground for Relief:** *Waiver of* **Miranda** *Rights*

In his first ground for relief, Wesson claims the trial court's admission into evidence of a statement he made to police shortly after his arrest violated his constitutional right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436 (1966). He argues that: (1) his waiver of his *Miranda* rights was not knowing and intelligent due to his intoxication at the time, low intellectual abilities, and the coercive nature of the police interrogation; and (2) the detectives who interviewed him failed to honor his subsequent withdrawal of his *Miranda* waiver and unequivocal assertion of his right to remain silent when he said to them, "'I ain't got nothin' to say to y'all.'" (Doc. 46 at 21-36 (quoting Doc. 36-1 (Police Interview Tr.) at 14).)

### A.    Procedural Posture

Wesson raised his claim challenging the validity of his waiver of *Miranda* rights on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits. *See Wesson*, 137 Ohio St. 3d at 316-18. This sub-claim, therefore, is preserved for federal habeas review.

Respondent counters, however, that Wesson did not raise his claim in state court that he attempted to withdraw his *Miranda* waiver yet the interrogation continued, and that claim therefore is procedurally defaulted. (Doc. 43 at 39-40.) Wesson does not respond to this argument.

As explained above, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Wesson never asserted in state court

either the factual or legal basis of his allegation here that he attempted to withdraw his *Miranda* waiver and invoke his right to remain silent but the interrogation continued.  Because that claim arises out of the record of proceedings in the trial court, it could have been raised on direct appeal.  Wesson failed to do so, however, and Ohio's *res judicata* doctrine now prohibits him from raising the issues in any post-conviction proceeding.  *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal).  And with no state-court remedies still available to him, Wesson has defaulted this sub-claim.  *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").

Moreover, Wesson does not offer any argument regarding the cause for, or prejudice resulting from, his procedural default of this sub-claim.  Nor does he contend that he is actually innocent such that the default should be excused.  Accordingly, Wesson's sub-claim regarding his attempted withdrawal of his *Miranda* waiver is, as Respondent asserts, procedurally defaulted.

**B.**  **Merits Analysis**

Even if Wesson had properly preserved both *Miranda* challenges to his statement to the police, they would fail. The Fifth Amendment privilege against self-incrimination is implicated whenever an individual is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Miranda,* 384 U.S. at 478. Because custodial interrogations are said to be inherently coercive, *Miranda* established that a suspect must be apprised of certain rights to protect the privilege against self-incrimination, including the right to remain silent. *Id*. at 444.

A suspect may waive his *Miranda* rights, however, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The prosecution must establish waiver by a preponderance of the evidence. *Id*. at 384 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

The *Miranda* waiver inquiry has two elements: (1) the waiver must be "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception'"; and (2) it must be "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id*. at 382-83 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). Coercive police activity "is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167. Whether a defendant has waived his *Miranda* rights and "voluntarily" confessed cannot rest on his state of mind

alone. *Id*. at 165. The second prong of the *Miranda* inquiry focuses not on whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege[,]" but on whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

"Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Courts must examine the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The prosecution does not need to show that a waiver of *Miranda* rights was express. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Thompkins,* 560 U.S. at 384 (quoting *Butler*, 441 U.S. at 376). A waiver of *Miranda* rights may be implied through "'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Id*. (quoting *Butler*, 441 U.S. at 373).

Finally, the defendant may withdraw a waiver of *Miranda* rights at any time. *Id.* at 387-88. And once a defendant invokes a right to counsel or to remain silent, further interrogation must cease. *Id.*

### 1. Validity of waiver

In rejecting Wesson's claim that his waiver of *Miranda* rights was invalid, the Ohio Supreme Court reasoned:

{¶ 33} Proposition of law V argues that Wesson did not validly waive his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore his motion to suppress his statement to the police should have been granted. Wesson received *Miranda* warnings and orally waived each *Miranda* right before making a statement to police. He nonetheless claims that "the combination of the lack of sleep, the alcohol, the coercive nature of the setting and defendant's lack of education combined to render [his] waiver invalid."

{¶ 34} When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination. *Miranda* at 478–479, 86 S.Ct. 1602, 16 L.Ed.2d 694. A suspect may then knowingly and intelligently waive these rights and agree to make a statement. *Id.* at 479, 86 S.Ct. 1602, 16 L.Ed.2d 694. If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence. *See id.* at 475, 86 S.Ct. 1602, 16 L.Ed.2d 694; *Colorado v. Connelly*, 479 U.S. 157, 168–169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 35} To determine whether a valid waiver occurred, we "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards,* 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus; *see also Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We have held that a waiver is not involuntary unless there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep. *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989).

{¶ 36} At the suppression hearing, the trial court heard testimony from an expert witness called by the defense, Dr. Robert Bellotto Jr., who used the Widmark Method to estimate Wesson's blood-alcohol level at the time of his statement based on information given to him by the defense. Some of the factors he considered included height, weight, age, gender, amount and type of alcohol and food consumed, alcohol-elimination rate, and history of alcohol use. Bellotto stated that a 50–year–old male chronic alcoholic who is five feet, seven inches tall and weighs 147 pounds, who consumed a large bottle of Mogen David wine (18 percent alcohol) and six to eight beers (5.5 percent alcohol) between early afternoon and 11:00 p.m., and who slept from approximately 11:15 p.m. to 3:15 a.m. would have a blood-alcohol level of .17 grams per deciliter at 4:00 a.m. But he conceded that he did not know how much alcohol or food Wesson had actually consumed on February 25 or Wesson's alcohol-elimination rate.

{¶ 37} During his testimony at the suppression hearing, Wesson claimed that he drank a "fifth" of Mogen David wine and a considerable amount of beer throughout the day on February 25, but that he did not drink any alcohol between 11:00 p.m. that evening, when he went to bed, and 4:00 a.m. the next morning, when police questioned him. He further claimed to have been intoxicated and falling from his chair during the interrogation.

{¶ 38} In response, the state presented testimony from four law enforcement officers who interacted with Wesson on the morning of February 26, 2008, each of whom testified that he did not observe any signs of intoxication or smell alcohol on his breath, and the three officers Wesson spoke to that morning testified that they did not detect any slurring of his speech. Wesson had had no trouble sitting upright or walking, and he responded appropriately to the questions asked. The officers who had questioned Wesson denied that he had fallen out of his seat during the interview. The state also presented the testimony of Steve Perch, a toxicologist from the Summit County Medical Examiner's Office, who questioned Bellotto's finding and stated that it would not be possible to correctly estimate Wesson's blood-alcohol level without knowing his elimination rate, his food consumption that day, or his typical alcohol consumption.

{¶ 39} The court denied the motion to suppress and found "the detectives' testimony credible and supported by the recording of [Wesson's] interview." After considering all the circumstances, the court determined that Wesson "made a knowing, voluntary, and intelligent waiver of his constitutional rights, and that his statement to police was voluntarily made."

{¶ 40} As we explained in *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, "[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id*. at ¶ 8. And we also stated: "[A]n appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*.

{¶ 41} Wesson argues that his intoxication, lack of sleep, and lack of education, in addition to the coercive nature of the interview setting, rendered the waiver of his constitutional rights invalid. Here, however, the trial court finding that Wesson validly waived his *Miranda* rights is supported by competent and credible evidence, consisting of the testimony of the four police officers and the audio recording of Wesson's statement. Wesson's claim of a limited education may evidence "low mental aptitude," but that alone does not demonstrate involuntariness. *State v. Hill*, 64 Ohio St.3d 313, 318, 595 N.E.2d 884 (1992), citing *Connelly*, 479 U.S. at 164,

107 S.Ct. 515, 93 L.Ed.2d 473. Notably, Wesson's prior criminal record shows familiarity with the criminal process, and he himself recited the *Miranda* warnings at the suppression hearing. This record does not support his allegation of police coercion, as neither the audio recording of the statement nor the testimony from the suppression hearing indicates any physical abuse, threats, or efforts to deprive Wesson of food, medical treatment, or sleep. The actions of the detectives in seating him in a fixed chair and handcuffing him to a steel table in an interrogation room while they questioned him for less than one hour do not amount to police coercion. *See McCall v. Dutton,* 863 F.2d 454 (6th Cir.1988) (no coercion when officers handcuffed a defendant and placed him on the ground, then numerous armed officers surrounded and yelled at him); *State v. Brewer,* 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990) ("find[ing] nothing improper in the 'length, intensity, and frequency' of the questioning" when there was no evidence of deprivation or mistreatment and "the actual interview took up only about three hours").

{¶ 42} Based on the totality of the circumstances presented here, Wesson validly waived his *Miranda* rights, and we reject this proposition of law.

*Wesson*, 137 Ohio St. 3d at 316-18.

Wesson argues that the state court's decision was an unreasonable determination of the facts in light of the evidence presented under § 2254(d)(2). (*See* Doc. 46 at 29, 32.) As he argued to Ohio's high court, Wesson asserts here that the circumstances surrounding his interrogation demonstrate that his *Miranda* waiver was neither voluntary, in that it was an "'uncoerced choice,'" nor knowing, such that he possessed the "'requisite level of comprehension.'" *Burbine*, 475 U.S. at 421 (quoting *Fare*, 442 U.S. at 725). Respondent contends the state court's conclusion that the waiver was valid was "fully supported by the record." (Doc. 43 at 40.) The Court agrees.

Wesson cites his intellectual disability, addressed below in detail in relation to his fourth ground for relief, as a factor preventing his knowing waiver of *Miranda* rights. (Doc. 46 at 29.) As the state court noted, however, low intelligence alone does not render a *Miranda* waiver involuntary. *Connelly*, 479 U.S. at 164 (rejecting argument that "a defendant's mental condition,

by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness'").

Indeed, Wesson places more emphasis on his alleged intoxication at the time of the police interrogation.  (*See* Doc. 46 at 29-32.)  He points to the trial testimony of Dr. Robert Bellotto, an expert in pharmacy/medical practice and forensic toxicology, who estimated that Wesson's blood alcohol level at the time of his interrogation was more than twice the legal limit for impairment in Ohio, which would have effected his executive brain functioning and judgment, even in a chronic alcoholic like Wesson.  (*Id*. at 29-30 (citing Doc. 13-6 (Suppression Hrg. Tr.) at 27-30).)  He cites the audio recording of the interrogation, in which he claims he sounds intoxicated with a "strained and raspy" voice and a "lethargic and foggy" manner.  (*Id*. at 30 (citing Doc. 36-1 (Police Interview Tr.) at 14, 15, 19, 30, 31, 40, 42, 49, 53, 54, 58-60).)  He claims he fell out of his chair while being interviewed because he was so drunk.  (*Id*. at 31 (citing Doc. 13-6 (Suppression Hrg. Tr.) at 91).)  And Detective Kebellar and a crime scene officer, he notes, both testified at trial that they could smell alcohol on Wesson around the time of the interrogation.  (*Id*. at 30-31 (citing Doc. 13-21 (Trial Tr.) at 55; Doc. 13-22 (Trial Tr.) at 112).)  Finally, Wesson points to the "fantastical story" he told police about his sexual relationship with the Varholas as evidence of his inebriation.  (*Id*. at 31 (citing Doc. 36-1 (Police Interview Tr.) at 20-23, 29).)

As the Ohio Supreme Court reasoned, however, four police officers were unequivocal in their testimony at the suppression hearing that Wesson was not impaired during the interrogation.  Officer Justin Ingham testified, for example:

> Well, I spent a period of time with [Wesson] in the interview room.  I was there when he was taken into custody at the scene.  I observed him walk both from the

scene to the wagon, I observed him walk inside the police station. Even while handcuffed behind his back, he was able to walk in a straight line without staggering. He was also able to articulate pretty well. As I previously stated, he seemed to be in possession of his faculties and answered in an appropriate manner when questioned.

(Doc. 13-6 (Suppression Hrg. Tr.) at 104; *see also* Doc. 13-6 at 137-38 (Parnell Test.), 145-47 (Kabellar Test.), 163 (Harrah Test.).) Detectives Kabellar and Harrah, in particular, denied that Wesson ever fell out of his chair during the interview. (*Id.* at 146, 163.) Further, this Court's review of the audio recording of the interview confirms the police officers' impressions. There is no indication that Wesson fell off his chair, and although Wesson's speech is somewhat slurred, that could be the result of a lack of sleep as much as any residual effects of his alleged earlier intoxication. (*See* Doc. 15-2 (Recording of Interview).) Finally, Steve Perch, a toxicologist from the Summit County Medical Examiner's Office, cast doubt on the defense expert's ability to accurately estimate Wesson's level of intoxication the morning he was interviewed by police. (*See* Doc. 13-6 (Suppression Hrg. Tr.) at 120-23.)

Moreover, noticeably lacking in Wesson's case is "the crucial element of police overreaching." *Connelly*, 479 U.S. at 163. Wesson claims the detectives "bullied him, sat close to him . . ., and made implied threats." (Doc. 46 at 31 (citing Doc. 13-6 (Suppression Hrg. Tr.) at 91-93).) But the only allegedly coercive conduct of the detectives that Wesson could recall when questioned about it at the suppression hearing was that one of the detectives – he could not remember which one – "[s]aid that he can get really mean." (Doc. 13-6 (Suppression Hrg. Tr.) at 93).) This allegation does not amount to "a substantial element of coercive police conduct." *Connelly*, 479 U.S. at 164. Nor does being handcuffed to a steel table for less than one hour while being interrogated. And, as the state court reasonably observed, there was no evidence in

35

the record – including the audio taped interview – of physical abuse, threats, or efforts to deprive Wesson of food, medical treatment, or sleep.

The Ohio Supreme Court's conclusion, therefore, that the record supported the trial court's ruling that Wesson's *Miranda* waiver was voluntary and knowing was not an unreasonable determination of the facts in light of the evidence presented under § 2254(d)(2).

### 2. Withdrawal of waiver

Wesson asserts that even if his *Miranda* waiver were valid, he "unequivocally" withdrew it during the police interrogation when he told the detectives, "I ain't got nothin' to say to y'all[,]" but they continued their interrogation nonetheless. (Doc. 36 at 51-52 (citing Doc. 36-1 (Police Interview Tr.) at 14).) This Court reviews this claim *de novo*, and AEDPA deference does not apply, because no state court adjudicated the claim. 28 U.S.C. § 2254(d).

As noted above, once a defendant has been instructed of his *Miranda* rights, if he "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. "[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *Emspak v. United States*, 349 U.S. 190, 194 (1955). But the suspect's invocation of the right must be unambiguous. *Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008) (citing *Davis v. United States*, 512 U.S. 452, 457 (1994)). The inquiry into whether a suspect has unambiguously asserted his right to remain silent is an "objective" one. *Id.* (citing *Davis*, 512 U.S. at 457). An interrogation must end, therefore, when a suspect asserts his right to remain silent "with sufficient clarity that a reasonable officer would perceive it as such under the circumstances." *Id.* Conversely, if a suspect's invocation of the right "is ambiguous or equivocal

in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the questioning may continue. *Davis*, 512 U.S. at 459 (emphasis in original); *see also Franklin*, 545 F.3d at 414 (stating that *Davis*, which concerned a suspect's assertion of the right to counsel, applies equally to the invocation of the right to remain silent).

Here, the detectives advised Wesson of his *Miranda* rights, and Wesson acknowledged that he understood them. (Doc. 36-1 (Police Interview Tr.) at 3-4.) After receiving the warnings, Wesson launched right into his story of what had happened the night before. (*Id*. at 4.) But almost immediately, Wesson began to express a sense of weary resignation to his predicament and powerlessness within the justice system, as if his fate were sealed and there was nothing he could do to change the situation. "It ain't make no difference to even say nothing to you sir," he told the detectives, "cause y...y...you ain't gonna believe it anyway." (*Id*. at 11.) Wesson argues he asserted his right to remain silent soon after, in this exchange with Detective Harrah:

| Wesson: | Yeah you know . . . (inaudible) cause there . . . there was a shortcut you know between the houses and everything and, uh, you ain't gonna believe this anyway so why even talk about it? |
|---|---|
| Harrah: | Well . . . |
| Wesson: | . . . cause they're a white couple and, uh, I'm a black single dude by myself so what's the difference man? |
| Harrah: | Well I mean it just . . . you gotta help us to understand your . . . you know your side of it cause we don't know. We're just going from what we saw and trying to get to the bottom of it. |
| Wesson: | They showed me pistols before, guns before and everything you know? You know. I don't even know what to say to y'all. |

| | |
|---|---|
| Harrah: | Okay now we . . . |
| Wesson: | . . . **I ain't got nothing to say to y'all.** |
| Harrah: | Well now we found you know we found your footprints coming out of the house. |
| Wesson: | Yeah. |
| Harrah: | Okay. |
| Wesson: | Ain't no doubt about that. |

(*Id*. at 14-15 (emphasis added).)

Afterward, Wesson continued to answer the detectives' questions. He also continued to express his resignation and frustration with their questioning, stating: "I know you got me already so . . . so why you asking me all these questions?" (*id*. at 45); "ain't gonna make any difference if I go to trial or not you know they're gonna eat me alive" (*id*.); "It's just death penalty or whatever you know ain't make no difference though." (*id*. at 46); "I'm going to jail anyway so . . . it makes no difference." (*id*. at 59); "My life already gone." (*id*. at 60). But Wesson did not refuse to answer the detectives' questions or otherwise demonstrate a desire to end the interrogation, stating at one point: "Oh man I'm tired of talking to y'all man. But I ain't trying to hide nothing." (*Id*. at 54.) As Respondent contends, these comments "were not based on a desire to revoke his *Miranda* waiver, but rather on a momentary belief that the investigators would not believe his account of what occurred." (Doc. 43 at 42.)

The Sixth Circuit found similar statements did not constitute unambiguous assertions of a defendant's right to remain silent in *Bird v. Brigano*, 295 F. App'x 36 (6th Cir. 2008). In that case, the defendant identified two instances during an interrogation where he maintained that he had unequivocally invoked his right to remain silent. *Id*. at 38. First, about a half hour into the

interrogation, Bird stated. "'there's no sense me sitting here trying to say what happened with me . . . because as usual, when it comes to Derrick Bird, he's guilty.'" *Id*. He then stood up, saying, "'You take me in; get booked, man.'" *Id*. The detectives told him to sit back down, and Bird continued to answer questions. *Id*. Second, after a detective later told him, "'This is your chance to talk about it. You [sic] been talking about it [to others],'" Bird replied, "'Everything's right there in the paper. I'm done talking about it.'" *Id*.

After examining the surrounding circumstances, the circuit court found that the defendant had not unequivocally invoked his *Miranda* rights, reasoning:

> Bird argues that his standing up, especially when coupled with his later statement that he was 'done talking about it,' could be viewed as an invocation of his right to silence. And taken in isolation, out of context, that is not an unreasonable conclusion. But context matters. When Bird stood up and talked about getting taken in (despite already being at the police station) the state court was not unreasonable in finding that his actions did not amount to an 'unambiguous' request for counsel. As the district court observed, this could reasonably be interpreted as simply an act of frustration, not an attempt to end the interview.

*Id*.

Here, too, placed in the context of his entire interview, a reasonable officer would not view Wesson's assertion "I ain't got nothing to say to y'all" as an unambiguous assertion of his right to remain silent. Rather, that comment, along with numerous others like it, reflected Wesson's frustration with, and resignation to, the very serious situation in which he found himself. This sub-claim also lacks merit.

## II.     Second and Third Grounds for Relief: *Ineffective Assistance of Trial Counsel*

In his second and third grounds for relief, Wesson claims his trial counsel provided constitutionally ineffective assistance. Specifically, he complains that counsel:

1.      failed to provide proper advice about the jury waiver;

39

2.      improperly handled the State's plea offer;

3.      failed to impeach Mary Varhola with her prior inconsistent statements to police;

4.      failed to present an expert in eyewitness perception and memory;

5.      failed to investigate, prepare, and present evidence during the guilt phase of trial regarding Wesson's relationship with Mildrain Ford and Emil Varhola's aggression;

6.      failed to investigate, prepare, and present mitigating evidence, including:

    a.      information contained in Wesson's prison records and an expert on prison culture,

    b.      lay witnesses who knew Wesson throughout life,

    c.      Wesson's brother's criminal record,

    d.      Wesson's efforts to redeem himself,

    e.      an expert on the link between Wesson's limitations and crimes, and

    f.      an expert on fetal alcohol spectrum disorder.[7]

(Doc. 36 at 103-37.)

## A.      Procedural Posture

### 1.      Sub-Claim 3: *failure to sufficiently impeach Mary Varhola*

Respondent argues that Wesson's ineffective-assistance sub-claim 3, as listed above, based on counsel's failure to sufficiently impeach Mary Varhola, is procedurally defaulted. (Doc. 43 at 44.)  Wesson raised this claim in his first post-conviction petition.  (Doc. 12-9 at

---

[7] Wesson also claims his trial counsel were ineffective for failing to investigate and present evidence regarding his intellectual disability (*see* Doc. 46 at 132-37), which the Court will examine below in connection with Wesson's fourth ground for relief, asserting he is intellectually disabled and therefore ineligible for execution.

184-86 (First Post-Conviction Pet.).)  Although the state trial court denied this claim on the merits, the court of appeals – the last state court to address the claim – found it barred by *res judicata*, as the claim was based on the trial-court record and therefore could have been raised on direct appeal.  *See State v. Wesson*, No. 25874, 2012 WL 4480109, at *5 (Ohio Ct. App. Sept. 28, 2012), *declining jurisdiction, State v. Wesson*, 140 Ohio St. 3d 1438 (Ohio 2014).

The state court explained:

{¶ 30} Wesson's eighth ground for relief claimed that trial counsel did not do enough to impeach Mrs. Varhola during the guilt phase. This alleged error also appears on the face of the record. All of the arguments contained in this claim focus on comparing Mrs. Varhola's testimony with the testimony of other witnesses. The alleged error could have been raised on direct appeal. For example, Wesson's brief in the Supreme Court points out that Mrs. Varhola was confused about several details, including the time and date of the attack and what happened during the crime. Merit Brief of Hersie Wesson, Supreme Court Case No.2009–0739, at 4. Wesson made these precise arguments in his petition for postconviction relief. Counsels' alleged failure to impeach Mrs. Varhola appeared on the record and, accordingly, is barred by res judicata.

{¶ 31} The trial court addressed these grounds for relief on the merits and concluded that Wesson was not entitled to relief. Because the alleged errors appeared on the record, they were barred by res judicata, and the trial court should have disposed of them on that basis. Nevertheless, this Court will not reverse a correct judgment merely because of a flaw in the trial court's analysis.

*Wesson*, 2012 WL 4480109, at *5.

Wesson agrees that the state court applied the procedural bar of *res judicata* to his claim. (Doc. 46 at 41-42.)  Ohio's *res judicata* rule precludes a defendant from raising for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or on direct appeal.  *State v. Perry*, 10 Ohio St. 2d 175, 180 (Ohio 1967).  And the Sixth Circuit has held that Ohio's *res judicata* doctrine is an adequate and independent state ground to

procedurally bar claims asserted in federal habeas actions. *E.g., Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

Wesson argues, however, that the state court misapplied the *res judicata* rule and the Court therefore should overlook the procedural bar and review the claim *de novo*. (Doc. 46 at 41-45.) Indeed, federal habeas courts may review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005); *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001). Wesson contends the state court misapplied the *res judicata* bar to this ineffective-assistance claim because the transcripts of Mrs. Varhola's two interviews with detectives Harrah and Kebellar – which were essential to prove her later testimony was inconsistent with statements she had made to the detectives during the interviews – were not placed in the trial-court record, and Wesson therefore could not have raised a claim based on those transcripts on direct appeal under Ohio law. (Doc. 46 at 42-43 (citing *State v. Madrigal*, 87 Ohio St. 3d 378, 390-91 (Ohio 2000); *State v. Kirkland*, 140 Ohio St. 3d 73, 82 (Ohio 2014)).)

There is merit to this argument. The state appellate court described this claim as focusing only on "comparing Mrs. Varhola's testimony with the testimony of other witnesses," which necessarily arose from the trial-court record. *Wesson*, 2012 WL 4480109, at *5. But this mischaracterizes Wesson's claim. Wesson also argued to the state court, as he does here, that counsel were ineffective for failing to sufficiently impeach Mrs. Varhola with *prior inconsistent statements* she had made to the detectives. (*See* Doc. 12-9 (First Post-Conviction Pet.) at 184-85.) This is a very different claim and one that would, in fact, require extra-record evidence – the interview transcripts. However, this Court need not resolve this procedural issue because, as

will be explained below, this claim can easily be resolved on the merits. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner"); 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits).

### 2. Sub-Claims 6(a), (c), and (e): *failure to present mitigating evidence and expert testimony*

Wesson also raised sub-claims 6(a), (c), and (e), as listed above, regarding the failure to investigate and present mitigating evidence and expert testimony, in his first state post-conviction petition, and they were adjudicated on the merits. *See Wesson*, 2012 WL 4480109, at *7-11, 13-14. These claims, therefore, are ripe for federal habeas review.

### 3. Sub-Claim 6(b): *failure to present lay mitigation witnesses*

In sub-claim 6(b), as listed above, Wesson claims that counsel should have presented at the mitigation phase of trial the following lay witnesses: Wesson's cousins Herb Wesson and Deborah Wells; Wesson's former employer, Edgar Lee; Wesson's son-in-law and former fellow inmate, Corbitt Norman; Wesson's maternal second cousin, Sharon Clark; and Wesson's paternal cousins, Randall Wesson and Stephen Wesson. (Doc. 46 at 122.) Respondent argues that this sub-claim is procedurally defaulted because Wesson raised it in his second post-conviction petition, and the state appellate court, the last state court to review the claim, denied it on procedural grounds. (Doc. 43 at 57.)

Wesson concedes that his claim based on counsel's failure to call Sharon Clark, Randall Wesson, and Stephen Wesson is procedurally defaulted. (Doc. 46 at 123.) But he contends that the default should be excused for cause – namely, his initial post-conviction counsel's failure to

raise the claims.  (*Id.*)  That argument will be addressed in the following section as it applies to these and the remaining ineffective-assistance sub-claims.

In addition, neither party acknowledges that Wesson raised this claim in his first state post-conviction petition as it relates to Corbitt Norman, Herb Wesson, Edgar Lee, and Deborah Wells.  *See Wesson*, 2012 WL 4480109, at *10-11, *14-15.  The state appellate court addressed the merits of those sub-claims, and they are preserved for federal habeas review.

### 4.     Remaining sub-claims:  1, 2, 4, 5, and 6(b) (partial), (d), and (f)

Respondent argues that Wesson's remaining ineffective-assistance claims – sub-claims 1, 2, 4, 5, and 6(b) (partial), (d), and (f), as listed above – also are procedurally defaulted.  (Doc. 43 at 50, 49, 46-47, 52, 63, 61, and 57, respectively.)  Wesson raised these claims in his second state post-conviction petition, which the state appellate court, the last state court to review the claims, dismissed as successive and untimely, stripping the court of jurisdiction.  *See State v. Wesson*, No. 28412, 2018 WL 1189383 (Ohio Ct. App. March 7, 2018), *declining jurisdiction, State v. Wesson*, 153 Ohio St. 3d 1433 (2018), *cert. denied*, *Wesson v. Ohio*, 139 S. Ct. 644 (2018).  As Respondent argues, the failure to timely file a post-conviction petition under Ohio's post-conviction scheme constitutes an adequate and independent state ground upon which to bar federal habeas review.  *See, e.g.*, *Foster v. Warden, Chillicothe Corr. Inst.*, 575 Fed. App'x 650, 652 (6th Cir. 2014).

Wesson concedes this point.  (*See, e.g.*, Doc. 46 at 54.)  But he argues that his default of the claims raised in his second post-conviction petition should be excused for cause due to the ineffective assistance of his post-conviction counsel under the Supreme Court decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  (Doc. 46 at

44

53-56, 64–66, 76-78, 88-90, 97-98, 119-22, 123.)  In *Martinez*, the Supreme Court held that the

"[i]nadequate  assistance of counsel at initial-review collateral proceedings may establish cause

for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id*. at 9.  This

holding represents a "limited qualification" to its prior decision in *Coleman v. Thompson*, 501

U.S. 722, 752 (1991).  *Martinez*, 566 U.S. at 15.  In that case, the Court held that prisoners have

no constitutional right to an attorney in state post-conviction proceedings, and, therefore, an

attorney's negligence in those proceedings cannot establish cause to excuse a habeas petitioner's

procedural default of claims in state court.  *Coleman,* 501 U.S. at 756-57.  The *Martinez* Court

explained that it created this exception to *Coleman* to acknowledge "as an equitable matter, that

the initial-review collateral proceeding, if undertaken without counsel or with ineffective

counsel, may not have been sufficient to ensure that proper consideration was given to a

substantial claim."  *Martinez*, 566 U.S. at 14.  It was careful to note the holding's limitations,

however, emphasizing that "[t]he rule of *Coleman* governs in all but the limited circumstances

recognized here."  *Id*. at 16.

　　　The Court elaborated on and expanded the *Martinez* exception a year later in *Trevino v.

Thaler,* .  In that case, it held that federal habeas courts may find cause to excuse a petitioner's

procedural default where:  (1) the ineffective-assistance-of-trial-counsel claim was "substantial";

(2) the "cause" consists of there being "no counsel" or "ineffective" counsel during the state

collateral-review proceeding; (3) the state collateral-review proceeding was the "initial" review

of the petitioner's ineffective-assistance-of-trial-counsel claim; and (4) state law requires that the

ineffective-assistance-of-trial-counsel claim be raised in the initial review post-conviction

proceedings.  *Trevino,* 569 U.S. at 423.  But the Court modified the fourth requirement so that

*Martinez* would apply in Texas, where state criminal procedure "on its face appears to permit (but does not require) the defendant to raise the claim [of ineffective assistance of trial counsel] on *direct appeal*." *Id*. (emphasis original). Wesson contends his claims satisfy the *Martinez / Trevino* test.

Wesson's claims meet the third and fourth requirements of the *Martinez / Trevino* test: the post-conviction proceeding at issue here provided the "initial" review of these ineffective-assistance claims, as required under Ohio procedural law. In *White v. Warden, Ross Corr. Inst*., 940 F.3d 270, 277 (6th Cir. 2019), the Sixth Circuit held that, although *Martinez* alone does not apply in Ohio because Ohio *permits* ineffective-assistance-of-trial-counsel claims on direct appeal, *Trevino* and its modification of *Martinez* does apply in Ohio in cases where it is "'highly unlikely' that a 'meaningful opportunity' existed for [Ohio courts] to review the ineffective-assistance claim on direct review." *Id*. (quoting *Trevino*, 569 U.S. at 429). This would occur in some cases because Ohio law limits reviewing courts on direct appeal "'to the record of the proceedings at trial.'" *Id*. (quoting *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013)). In Ohio, therefore, when an ineffective-assistance claim is based on evidence outside the trial record, it can only be raised on post-conviction review, falling under *Trevino*'s expanded *Martinez* rule. *Id*.

Respondent asserts, with no analysis, that "Wesson has offered no basis for excusing appellate counsel's failure to raise his claim[s] on direct appeal." (Doc. 43 at 47.) But these types of ineffective-assistance claims must rely on extra-record evidence to prevail. Sub-claims 1 and 2 allege that trial counsel failed to properly advise Wesson about the jury waiver and handle the State's plea offer; these claims must be supported by evidence of

communications between defense counsel and Wesson and the prosecutors, which would not be contained in the record. And the remaining sub-claims are based on counsel's failure to investigate or present evidence and expert testimony; they, too, necessarily would require the submission of the extra-record evidence he claims was overlooked or omitted from the defense's case.

As the Sixth Circuit observed in *White*, "[i]n *Trevino,* the Supreme Court recognized that 'the need to expand the trial court record' is critical to ensuring meaningful review." *White*, 940 F.3d at 277 (quoting *Trevino*, 569 U.S. at 428). The court added that "Ohio courts, too, have recognized this necessity and have refused to adjudicate ineffective-assistance claims on direct appeal because of the need for additional evidence." *Id.* (citations omitted). "In these instances, Ohio effectively requires defendants to raise ineffective-assistance claims in post-conviction petitions." *Id.* The Court finds, therefore, that, as in *White*, *Trevino* applies in this case, satisfying the fourth requirement of the *Martinez / Trevino* test.

Wesson's claims do not, however, meet the first and second requirements – namely, that they are "substantial" and post-conviction counsel was ineffective for failing to raise them. As will be explained below, even if the Court were to review sub-claims 1, 2, 4, 5, and 6(b) (partial), (d), and (f), these claims "do[] not have any merit." *Martinez*, 566 U.S. at 16. And it follows, therefore, that post-conviction counsel was not constitutionally ineffective for failing to raise

47

them.[8]  Accordingly, Wesson's default of these sub-claims is not excused under the *Martinez /*

*Trevino* rule and the claims are procedurally defaulted.

### B.    Merits Analysis

Even if all of Wesson's claims of ineffective assistance of trial counsel were preserved

for federal habeas review, they would not prevail.  The Supreme Court has long recognized the

Sixth Amendment right to the effective assistance of counsel at trial as a "bedrock principle in

our justice system."  *Martinez,* 566 U.S. at 12; *see also Gideon v. Wainwright*, 372 U.S. 335,

342-44 (1963).  The Court announced a two-prong test for claims of ineffective assistance of

counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, the petitioner must

demonstrate that counsel's errors were so egregious that "counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  To determine if

counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that

the representation fell "below an objective standard of reasonableness."  *Id.* at 688.  It must

---

[8] For the same reason, the Court also denies Wesson's request for an evidentiary hearing on the procedural default of sub-claims 1 (jury waiver); 2 (plea offer); 3 (impeachment of Mrs. Varhola with prior inconsistent statements); 4 (eyewitness memory expert); and 6(f) (fetal alcohol spectrum disorder expert).  (*See* Doc. 47.) "[W]hen a court is able to resolve a habeas claim on the record before it," and the petitioner "has not identified any evidence that he would introduce other than exhibits already made part of the state or federal habeas record," an evidentiary hearing is not necessary.  *Black v. Carpenter*, 866 F.3d 734, 742 (6th Cir. 2017) (citing *Sawyer v. Hofbauer*, 299 F.3d 605, 612 (6th Cir. 2002)) (finding district court acted within its discretion in denying petitioner's request for an evidentiary hearing on *Atkins* claim where he failed to demonstrate that a "hearing was required in order for the district court properly to evaluate the voluminous record before it" under the state standard for intellectual disability).

"reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id*. at 693 (citation omitted). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.*

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356. 371 (2010)). It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted). Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have

in making tactical decisions.'" *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting

*Strickland,* 466 U.S. at 689).

The Court has observed that the standards imposed by *Strickland* and § 2254(d) are both

"highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington,* 562

U.S. at 105 (internal quotation marks and citations omitted).  It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies,
> the question is not whether counsel's actions were reasonable.  The question is
> whether there is any reasonable argument that counsel satisfied *Strickland's*
> deferential standard.

*Id.*

### 1.     Failure to properly advise Wesson about his jury waiver

Wesson argues that his trial counsel were constitutionally ineffective for misinforming

him that he could not withdraw his waiver of his right to a jury trial when he asked his attorneys

if he could to do so shortly after signing a waiver and before his trial began.  (Doc. 46 at 71-82.)

In Ohio, a defendant may withdraw a jury waiver "at any time before the commencement of the

trial."  Ohio Rev. Code § 2945.05.  Because no state court has adjudicated this claim on the

merits, this Court reviews the claim *de novo*.

Wesson waived his right to a jury trial, whether orally in court or by signing a court

document, three times.  On January 6, 2009, the court conducted a hearing on the matter, at

which Wesson appeared in court with counsel.  (Doc. 13-16 (Trial Tr.).)  His attorney told the

court that he had spoken to Wesson and Wesson's sister and cousin about numerous issues for a

"long time" the day before, and Wesson "indicated his desire to waive the jury."  (*Id*. at 3.)  He

explained that he had just "spent a few minutes in the back room" with Wesson going over the

court's prepared "Waiver of Trial by Jury," and defense counsel and Wesson had signed it.  (*Id*. at 4; *see also* Doc. 12-6 at 11 (Written Jury Waiver).)

The judge then conducted an extensive colloquy with Wesson, in which Wesson agreed that he had had "ample opportunity" to discuss the waiver with his attorneys; he understood what rights he was relinquishing and the charges and possible penalties he faced; and he was comfortable with his decision.  (Doc. 13-16 (Trial Tr.) at 4-20.)  Wesson also spoke up when he did not understand something the judge had said or needed time to privately discuss a matter with counsel.  (*See id*. at 6-7, 17.)  And Wesson denied being threatened, coerced, or forced into waiving his jury rights.  (*Id*. at 15.)  His attorney attested, "We've talked about this issue for six months at various times and he's spent a great deal of time in the last four hours talking about it, so I think he is cognizant of all of the ramifications, all of his rights, and feels as I do and as Don does that this is the appropriate way to go in the case."  (*Id*. at 16-17.)  The judge then read Wesson the written Waiver, and Wesson acknowledged understanding it and voluntarily signing it.  (*Id*. at 18-20.)

Wesson and his counsel appeared in court the next day as well, and Wesson signed an Amended Waiver of Trial by Jury.  (Doc. 13-17 (Trial Tr.) at 2-5.)  The amended waiver stated that the two additional judges were "to be designated pursuant to law" rather than by the Chief Justice as noted in the original written waiver.  (Doc. 12-6 at 14-15 (Amended Waiver of Trial by Jury).)

Wesson did not complain about his trial counsel's advice concerning his jury waiver until his second state post-conviction petition in 2015.  He submitted an affidavit with the petition in which he averred that "[o]n the day [he] needed to sign the jury waiver," while still in the

courthouse, he "changed [his] mind about it" and "wanted to take [it] back . . . ." (Doc. 41-1 at 161 (Wesson Aff.).) But, he recalled, his attorneys told him "'no' . . . [he] could not take [his] jury waiver back because it was 'too late.'" (*Id*.) He attested that he would have withdrawn the waiver if he had known it was permissible. (*Id*.) Wesson also submitted with his second post-conviction petition copies of two emails his attorney Whitney sent to a defense expert. In one, dated December 18, 2008, he wrote that he had visited Wesson the previous Friday and Wesson "want[ed] a jury." (*Id*. at 165 (Whitney Dec. Email).) In the other, dated January 7, 2009, Whitney stated that Wesson "agree[d] to waive the jury and consent to a panel. He changed his mind a few times since then but he has entered a waiver of jury." (*Id*. at 166 (Whitney Jan. Email).) Wesson asserts that this evidence demonstrates his trial counsel's deficient performance in misinforming him about his ability to withdraw his jury waiver.

Respondent disputes that the record supports this claim. (Doc. 43 at 51.) He argues that the Sixth Circuit's decision in *Sowell v. Bradshaw*, 372 F.3d 821 (6th Cir. 2004), is on point. In that case, the petitioner argued that his trial counsel provided constitutionally ineffective assistance by advising him to waive a jury trial without sufficient assurances that the jury waiver would result in him escaping the death penalty. *Id*. at 827. The court found that counsel did not perform deficiently, because, although he may have advised the petitioner to waive a jury trial based on a mistaken belief that the judge who would preside over the trial would not impose the death penalty, the record did not show that counsel had no reasonable basis for that belief, or that he ever guaranteed the petitioner a particular result or misstated the law. *Id*. at 837-38. In fact, counsel discussed the waiver with the petitioner at length, which the petitioner acknowledged. *Id*. at 837.

Similarly, here, Wesson's trial counsel discussed the issue of a jury waiver extensively with him. The judge also carefully and thoroughly questioned him about his understanding of the waiver. Wesson expressly and repeatedly agreed that he understood the nature of the rights he was waiving and the charges and penalties he faced, and told the judge when he did not understand something and needed clarification from counsel. At no point did Wesson express any reservation about the waivers when he signed them in court.

Wesson asserts that his situation differs from *Sowell* because his trial counsel misstated the law about his ability to withdraw the waiver. (Doc. 46 at 80.) But the record does not provide conclusive evidence that the alleged misstatement of law occurred. The emails do nothing more than show what is undisputed: that Wesson wavered in his decision about having a jury trial. They do not establish that Wesson changed his mind *after* signing the original or amended waiver and was then given the alleged erroneous information about withdrawing them. That leaves just Wesson's affidavit as support for this claim, which alone is insufficient evidence of counsel's misconduct. *See, e.g., Hoffner v. Bradshaw*, 622 F.3d 487, 500 (6th Cir. 2010) (declining to credit a "self-serving" affidavit declaring that habeas petitioner told his counsel that he had requested an attorney before being interrogated and was denied one but trial counsel said it "didn't matter" and failed to move to suppress taped confession on that ground where there was evidence in the record to contradict it).

Counsel's performance with regard to the jury waiver, therefore, did not fall below an objectively unreasonable level, and the Court need not discuss *Strickland*'s prejudice prong.

**2.      Failure to properly handle plea offer**

Wesson also faults his trial counsel for improperly handling the State's plea offer on the aggravated murder charge.  (Doc. 46 at 59-71.)  He claims that, although his trial counsel advised him to accept a plea offer of life without parole, counsel "affirmed Wesson's false assumption that the State would not indict a defendant for similar crimes if committed against African American victims."  (*Id*. at 60.)  From that point, Wesson alleges he was convinced that the plea offer "was not so good because [he] was black and the Varholas were white."  (Doc. 41-1 at 162 (Wesson Aff.).)  This sub-claim, too, is reviewed *de novo*.

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'"  *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).  The parties conducted extensive plea negotiations in Wesson's case.  At a pretrial hearing, the prosecutor explained:

> Your honor, the reason we're here is the State had made an offer to this defendant that in exchange for a plea of aggravated murder, attempted aggravated murder, and tampering with evidence the State would be willing to dismiss all death specifications and we would proceed on an agreed sentence and ask the Court to impose a sentence of life without parole.
>
> It is the State's understanding this defendant is declining that offer.

(Doc. 13-13 (Pretrial Hrg. Tr.) at 2.)  Wesson's attorney then stated," Yes, Judge, that is correct. We came here today for that – for the purpose of trying to resolve the case, and apparently cannot."  (*Id*. at 4.)

Other members of Wesson's trial team also tried to convince Wesson and his family to accept a plea.  The mitigation specialist, Thomas Hrdy, wrote to the psychologist expert, Jeffrey Smalldon, that "our negotiations fell [through] for [life without parole].  Hersie's family was against it and Hersie won't do it without them."  (Doc. 41-1 at 164 (Hrdy Email).)  Dr. Smalldon

replied, "Obviously, I'm distressed to hear the news re the role of Hersie's family in convincing him not to take a plea. . . . I was up to see Hersie last week, and when I left I felt fairly certain that he'd be open to taking it." (*Id.* (Smalldon Email).)

The day the trial began, Wesson's lead counsel, Whitney, proffered information into the record, outside the presence of the three-judge panel, regarding the plea negotiations and his struggle to convince Wesson and his family to accept the State's offers. He recounted:

> Early on a couple of months ago . . . there was discussion about Hersie pleading to life without parole.
>
> At that time we actually did work out a plea to life without parole.
>
> I have a letter that I sent to Margaret Kanellis which does, in fact, outline what that plea was going to be.
>
> We came here ready to make that plea and then Hersie would not do it that day.
>
> We then had many, many discussions with his family, being his sisters and his cousins and Hersie; in fact, the judge was kind enough to permit us to even have the family here at one point to talk with Hersie about negotiating the case.
>
> There was some talk, actually, about a 30-to-life plea.
> . . .
>
> That may have come about, but Hersie just turned all of those down.
>
> He didn't want . . . to plead to life without parole, nor did he want to plead to 30 to life. And wouldn't authorize us to negotiate any of those kinds of pleas.
>
> I'm putting this on the record now just so that my recollection of that is – and Don's recollection of that is evident, that our recollections are fresh regarding that now, rather than if something happens in this case rather than three or four years from now and try to rethink what was discussed.
>
> So, we're just putting it on the record that – actually Tom Hrdy talked with the family, who is our mitigation person, talked with the family about – Hersie's family meaning his sisters and that and others, about trying to negotiate life without parole; they were against it, for it, against it, back and forth.

Dr. Smalldon, our mitigation psychologist, talked with Hersie at some length about that, trying to resolve the case, and thought maybe that we should – that things were moving along toward that end; and we gathered up again for that, I went over and saw Hersie and spent a long time with him and his family talking about that in the jail; but it never really came to fruition at all and Hersie made the decision that he wanted a trial in which then he made the decision to withdraw his right to a jury and try to a three-judge panel.

And, again, we don't want this to be public record to go into the – not public record, but certainly not a record that we want the judges to see; and I asked the Judge, Judge Teodosio, if he would be kind enough to give us the opportunity to put it on the record outside of the presence of the three Judges and he permitted that.
. . .

And there's been a lot of effort to do that over the – from the beginning of the case until actually it's now almost 3:00 and actually I mentioned it to Hersie again at 1:00 and he said, "We're ready to go, I'm going to go."

So, we're here trying the case.

(Doc. 13-18 (Trial Tr.) at 20-24.)

Wesson acknowledges that the State offered him a plea of life without parole. (Doc. 46 at 63 (citing 41-1 at 161-62 (Wesson Aff.)).) His complaint, rather, is that his attorney Hicks "unsettled" him about the nature of the plea, which led him to reject the offer. He explained in his affidavit:

I was very confused about the plea and what to do.

When I talked about the plea with my trial lawyers, I asked them: "If the victims were black and lived on the east side of Akron, do you think I'd get the death penalty or something like fifteen to life?" Don Hicks said, yes, if that was the case, the offer would be something like fifteen to life. I knew then that the plea offer was not so good because I was black and the Varholas were white. My lawyers did not say anything to change my opinion about that. What my lawyer told me made me think that the race of the Varholas was why I didn't get a better plea offer.

(Doc. 41-1 at 161-62 (Wesson Aff.).)

In addition, Wesson claims he "needed more information about pleading out to a death penalty case compared to [pleading in noncapital cases]." (*Id*. at 162.) He did not know, for example, what it was like to live on death row. (*Id*.)

Respondent argues that this record precludes a claim of ineffective assistance under *Lafler* because, as Wesson concedes, his counsel advised him to accept the State's offer. (Doc. 43 at 49-50.) The Court agrees. Defense counsel struggled over many months to convince Wesson and his family to accept a plea offer, and were so concerned about his refusal to do so that they placed an account of their efforts in the record. One of the attorneys may have told Wesson that the race of his victims impacted the plea offer, as Wesson alleges, but that does not mean his counsel told him the offer was not "so good." And his lawyers may not have been able to change his mind about that, as Wesson claims, but that does not mean they did not try. The record demonstrates they did, in fact, try very hard to persuade Wesson to accept the plea offer. There is no evidence that counsel performed deficiently in those efforts, and this sub-claim fails.

### 3. Failure to impeach Mary Varhola

Wesson also claims his trial counsel were ineffective in failing to sufficiently impeach the credibility of Mary Varhola, the victim's wife who survived the attack and was the State's key witness. (Doc. 46 at 37-48.) He raised this claim in his first post-conviction petition. (Doc. 12-9 at 184-86 (First Post-Conviction Pet.).) As the last state court to review this claim found it procedurally barred and did not adjudicate it on the merits, as explained above, the Court will also review this sub-claim *de novo*.

Because Mrs. Varhola's health was too fragile for her to appear at trial, her testimony was presented and admitted at trial through a videotaped deposition conducted two months

beforehand.  (*See* Doc. 13-20 (Trial Tr.) at 50-51.)  Wesson asserts that Mrs. Varhola's

deposition testimony was inconsistent in several significant respects with statements she had

made to detectives during two interviews, on March 24, 2008, and July 22, 2008, and was

influenced by the detectives' questioning.  (*See* Doc. 46 at 45-46.)  Wesson concedes that his

attorneys did, in fact, cross-examine Mrs. Varhola during her deposition about numerous

inconsistent statements she had made to the police.  (*Id*. at 40-41.)  But he faults his counsel for

not pressing her further on these inconsistencies.  In particular, she testified at her deposition that

Wesson told her he wanted to kill his girlfriend; but counsel did not ask her if she told the

detectives that she believed the assailant's girlfriend may have helped him hide the knife after

the attack.  (*Id*. at 45.)  Finally, counsel did not ask Mrs. Varhola about her inconsistent

statements regarding the amount of times Wesson had visited her home before the attack.  (*Id*. at

41.)

      "Whether, and to what extent, a witness should be cross-examined is 'virtually

unchallengeable' if the decision is made after considering the relevant law and facts."  *Clements*

*v. United States*, No. 16-3063, 2017 WL 3185180, at *5 (6th Cir. 2017) (quoting *Strickland*, 466

U.S. at 690).  *See also Campbell v. United States*, 364 F.3d 727, 735 (6th Cir. 2004) (holding

that counsel's performance in failing to impeach coconspirator with minor inconsistencies in

coconspirator's prior trial testimony was not deficient, but was reasonable trial strategy); *Moss v.*

*Hofbauer*, 286 F.3d 851, 864 (6th Cir. 2002) (holding decision not to cross-examine a witness

was strategic choice made after considering the relevant law and facts and therefore "virtually

unchallengeable" under *Strickland*; dissent's reliance upon hypothetical areas of cross-

examination "contradicted *Strickland*'s admonition against second-guessing the performance of counsel").

In this case, a review of the Mrs. Varhola's testimony demonstrates that Wesson's counsel conducted a thorough and meaningful cross-examination of Mrs. Varhola, including asking her numerous questions about her prior statements to police. For instance, defense counsel repeatedly asked Mrs. Varhola at her deposition if she recalled telling the detectives that she saw the assailant in her kitchen before he attacked her husband, but she was adamant that she did not see the assailant until after the attack. (Doc. 13-20 (Trial Tr.) at 118-20.) During another period of questioning, defense counsel tried to get Mrs. Varhola to confirm her statement to the detectives that she did not see the assailant take anything out of the house, but she stuck with her account that she saw the attacker steal money from her purse and take her husband's wallet. (*Id.* at 121-22.) Defense counsel also was able to show the inconsistencies between Mrs. Varhola's deposition testimony and her police interviews through examining Detective Harrah. Attorney Whitney went over the transcripts of the police interviews of Mrs. Varhola in great detail. (Doc. 13-23 (Trial Tr.) at 84-91.) He asked Harrah, for example, whether Mrs. Varhola told him about the attacker taking her husband's wallet, and he testified that she said he "'probably did.'" (*Id.* at 87.) Wesson's counsel highlighted the inconsistencies in her testimony in their closing argument. (*See, e.g.*, Doc. 13-25 (Trial Tr.) at 28.)

Given these efforts to impeach Mrs. Varhola with her prior inconsistent statements, counsel may have made a legitimate tactical decision to forgo further challenging a confused, frail, and highly sympathetic witness, especially when her testimony, confused as it was, was damaging and the other evidence against Wesson was substantial. *See Strouth v. Colson*, 680

F.3d 596, 602 (6th Cir. 2012) ("It is not easy to satisfy *Strickland* through the failure to impeach prosecution witnesses when the impeachment evidence is weak and cumulative, and the evidence of the defendant's guilt is "overwhelming," all true here."). This sub-claim is meritless.

### 4. Failure to present eyewitness identification expert

Wesson also complains that his trial counsel were ineffective in failing to present an eyewitness memory expert to further undermine Mrs. Varhola's testimony. (Doc. 46 at 48-59.) Wesson raised this claim in his second post-conviction petition, which was denied on procedural grounds, and this sub-claim is therefore subject to *de novo* review.

Wesson supports this claim with the an affidavit of Dr. Scott Gronlund, a tenured professor of psychology at the University of Oklahoma and expert in memory and eyewitness identification. (Doc. 41-2 at 1 (Gronlund Aff.).) He contends that an expert such as Dr. Gronlund could have explained to the court how memory works and how difficult it is to distinguish a memory of a real event from a suggested or inferred event. (Doc. 46 at 57.) Dr.Gronlund opined that Mrs. Varhola's testimony was "an amalgamation of actual and imagined/suggested events that cannot be teased apart." (Doc. 41-2 at 5 (Gronlund Aff.).)

Trial counsel provides ineffective assistance when he or she "'fails adequately to investigate, and to introduce into evidence, information that demonstrates [a] client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict.'" *Jackson v. Bradshaw*, 681 F.3d 753, 762 (6th Cir. 2012) (quoting *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007)). The Supreme Court has recognized that "identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *United States v. Wade*, 388 U.S. 218, 228

(1967).  While the Sixth Circuit has noted that "eyewitness misidentification accounts for more false convictions in the United States than any other factor[,]" and expert testimony on the subject is "'universally recognized as scientifically valid and of 'aid to the trier of fact' for admissibility purposes.'"  *Jackson*, 681 F.3d at 762 (quoting *Forensic v. Birkett*, 501 F.3d 469, 478, 482 (6th Cir. 2007)).

Nevertheless, "[t]he selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'"  *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (quoting *Strickland*, 466 U.S. at 690).  In *Jackson v. Bradshaw,* the Sixth Circuit held that a trial counsel's decision not to present expert testimony on eyewitness identification was not unreasonable where they had used other means to demonstrate the potential weaknesses of eyewitnesses' identification of the petitioner.  *Jackson*, 681 F.3d at 762-63.  Defense counsel in that case instead relied on cross-examination and closing arguments to impeach the eyewitness testimony.  *Id*. at 763.  The court also concluded that there was no prejudice to the petitioner even if counsel were deficient in this respect because the eyewitness identification was not the "entire basis of the prosecution's case" against the petitioner.  *Id*.

Similarly, as explained above, Wesson's trial counsel used their cross-examination of Mrs. Varhola and the detectives and their closing argument to emphasize Mrs. Varhola's many inconsistent statements to the detectives.  Moreover, as Respondent argues, this is not a case where the eyewitness identification was critical to the prosecution.  The State had substantial other evidence of Wesson's commission of his crimes, including his admission of guilt, the cuts on his hands and blood on his clothing and shoes when he was found by police, Wesson's blood

found in the Varhola's house, Mr. Varhola's rifle with Wesson's DNA on it that was found in the Varhola's yard, and Mr. Varhola's empty wallet that was found on a neighbor's property.  (Doc. 13-25 (Trial Tr.) at 37-42 (prosecution's closing argument describing evidence admitted against Wesson).)

Wesson's trial counsel, therefore, did not provide ineffective assistance in failing to present an expert on eyewitness identification to impeach Mrs. Varhola's credibility, and this claim fails.

> ### 5. Failure to investigate, prepare, and present evidence during the guilt phase of trial regarding his relationship with Mildrain Ford and Mr. Varhola's aggression

Wesson also asserts that his trial counsel should have presented evidence concerning:  (1) his relationship with his girlfriend, Mildrain "Mimi" Ford, to rebut the prosecution's theory that he went to the Varhola's house that night to steal a gun with which he could murder Ms. Ford; and (2) Mr. Varhola's alleged "history of aggressive behavior," to support Wesson's assertion that Mr. Varhola provoked him to become violent.  (Doc. 46 at 83-102.)  Because Wesson raised these claims in his second post-conviction petition, which the state appellate court denied on procedural grounds, the Court reviews these claims *de novo*.

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *see also Gonzalez v. United States*, 533 U.S. 242, 249 (2008) ("Numerous choices affecting conduct of the trial, including . . . the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for

the trial."). Thus, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 2016) (en banc).

Wesson contends his trial counsel should have investigated and presented evidence at trial about his "amiable relationship" with Mildrain Ford, who filed a police report against him the day of the murder after a dispute, leading numerous law enforcement agencies to search for him. (Doc. 46 at 90-91.) He asserts that this evidence would have undercut the State's theory that Wesson's motive in the attack was to steal a gun to use to kill Ford. (*Id*.) Wesson cites to several police reports of complaints filed by Ford against Wesson. The first is the report filed on February 25, 2008, the day of the murder, reporting that Ford "stated that the suspect called and threatened to kill her and break into her apartment." (Doc. 41-2 at 52.) Another, filed on February 4, 2008, recounted that Ford claimed Wesson had kicked in her door and punched her in the head, but the police did not observe any physical marks on her and could not determine a "primary physical aggressor." (*Id*. at 53.) The officers advised Ford to "follow up with the prosecutor." (*Id*.) A third, filed on September 14, 2007, reported that Ford claimed Wesson stole her purse, but that she has "mental health issues" and seemed "very paranoid." (*Id*. at 55.) Other records showed that Ford frequently made emergency calls (*id*. at 74, 76, 78), one of which concerned an allegation that Wesson had threatened her with a knife (*id*. at 62). Wesson also points to letters between him and Ford that he claims "establish a romantic relationship" between them that continued after Wesson was convicted. (*Id*. at 31-49.)

Wesson also argues that his trial counsel should have presented evidence of Mr. Varhola's alleged "history of aggressive or threatening behaviors," to bolster his statement to the

police that Mr. Varhola suddenly became angry with him and provoked him into fighting and to undermine the State's theory that Wesson's violent attack on the Varholas was part of a purposeful plan to steal a gun to use against his girlfriend. (Doc. 46 at 99-101.) As support, Wesson points to evidence of two complaints about Mr. Varhola's conduct made by neighbors in 1997 (*id.* at 24-27), and court records showing Mr. Varhola was charged with disorderly conduct in 1998 and convicted of assault and battery in 1962 (*id.* at 28-29.)

Wesson's counsel were not ineffective for failing to investigate or present this evidence at trial. They reasonably could have concluded that this information had limited, if any, probative value, and Wesson would be more prejudiced by its introduction than its omission. The evidence about Ms. Ford does not show that she and Wesson had an "amiable relationship" before the murder, the time period most relevant to Wesson's motive in the attack. If anything, the evidence is more akin to impeachment evidence, which counsel could have deduced would backfire on Wesson by portraying the opposite of a loving relationship; instead, the records show a volatile relationship between a troubled, unstable woman and a threatening, aggressive man, fitting neatly with the prosecution's theory of the case. Similarly, the evidence of Mr. Varhola's alleged unneighborly behavior and prior convictions for disorderly conduct and assault – all of which occurred at least a decade before his death and one of which (the assault) happened more than forty years before his murder – would be just as likely to offend a trier of fact for maligning the victim of a violent murder as bolster Wesson's implausible-on-its-face story that Mr. Varhola, an 81-year-old man in poor health who used an oxygen tank to breathe, suddenly instigated a fight with him. This sub-claim lacks merits.

### 6. Failure to investigate, prepare, and present mitigating evidence

Wesson's third ground for relief alleges that his trial counsel also were ineffective in investigating, preparing, and presenting certain witnesses and other evidence at the sentencing phase of his trial, including: (1) information contained in his prison records and an expert on prison culture; (2) lay witnesses who knew Wesson throughout life; (3)Wesson's brother's criminal record; (4) Wesson's efforts to redeem himself; (5) an expert on the link between Wesson's limitations and crimes; and (6) an expert on fetal alcohol spectrum disorder.

Counsel in capital cases have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). In *Strickland*, the Supreme Court noted that a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable: "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland*, 466 U.S. at 686; *see, e.g., Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (petitioner had an "excruciating life history," yet counsel focused exclusively on his direct responsibility for murder); *Rompilla*, 545 U.S. at 389-93 (counsel ineffective where he failed to examine court file of defendant's prior conviction which contained a range of vital mitigation leads regarding defendant's childhood and mental health problems); *Frazier v. Huffman*, 343 F.3d 780, 795-99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury).

Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383. *See, e.g., Wiggins*, 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S. 776 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information). The Court cautioned in *Strickland* that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

>        a.    **information contained in Wesson's prison**
>              **records and expert testimony regarding prison**
>              **culture**

Wesson first faults his trial counsel for not presenting mitigating evidence from his prison records and expert testimony regarding prison culture to demonstrate that he could adapt well to life in prison if given a life sentence. (Doc. 46 at 108-12; 114-16.) He presented these claims in his first state post-conviction petition, and they were adjudicated on the merits. The last state court to review the claims, the state appellate court, opined:

> {¶ 42} In his first three grounds for relief, Wesson argued that he was denied the effective assistance of counsel because of counsels' failure to investigate, prepare, and present evidence of his ability to adapt to prison. He relies on *Skipper v. South Carolina*, 476 U.S. 1 (1986), to support his argument.

> {¶ 43} Ronald Skipper was held for more than seven months while waiting for his murder trial. *Id.* at 4. At his capital sentencing hearing, he sought to introduce evidence of his good behavior in jail during the time he waited for trial. *Id.* The trial

court denied his request to call three witnesses to testify about his jail behavior during his pretrial detention. *Id.* at 3. The prosecutor, however, in closing argument, told the jury of the dangers Skipper would pose if sentenced to prison; he even argued that Skipper could be expected to rape other inmates. *Id.* at 3. The jury sentenced Skipper to death. *Id.* The United States Supreme Court held that under these circumstances, it appeared reasonably likely that the exclusion of evidence of good behavior in jail while awaiting trial may have affected the jury's sentencing decision. *Id.* at 8.

{¶ 44} The Supreme Court described this type of evidence as "potentially mitigating." *Id.* at 5. In a footnote, the Court recognized that the relevance of this evidence may hinge on the State's case. *Id.* at n. 1. For example, the prosecutor argued that Skipper could not be trusted if he were sentenced to prison. *Id.* at 5. Where the state "relies on a prediction of future dangerousness" in seeking the death penalty, the defendant must be given an opportunity to present evidence in response. *Id.* at n. 1.

{¶ 45} In this case, the State did not argue that Wesson would be dangerous if he were incarcerated and the trial court did not exclude any relevant evidence. In fact, Wesson was able to introduce evidence of his past adjustment to prison through the testimony of Dr. Smalldon, a forensic psychologist who testified extensively in mitigation.

{¶ 46} In his petition, Wesson argued that his conduct during his previous 20 years of incarceration demonstrated that he would not be a threat to anybody in prison and, therefore, he would be a good candidate for a sentence for life without parole instead of death. When considering Wesson's sentence, the trial court noted that it gave a small amount of weight to Wesson's cooperative conduct in jail and the absence of bad conduct in prison.

{¶ 47} Wesson's first and second grounds for relief were that trial counsel failed to investigate and present evidence about his adaptability to prison and his positive contributions to prison life. Wesson focused on three main points in support of these grounds for relief to argue that trial counsel could have done more.

{¶ 48} Wesson presented hundreds of pages of his prison records in support of these grounds for relief. These records show that Wesson spent many years of his adult life in prison. They also demonstrate that he had his share of problems while incarcerated.

{¶ 49} Wesson has used these records, and the report of a postconviction expert witness, Dr. Clemons Bartollas, to argue that his prison record shows that he adapted well to incarceration. That conclusion is debatable, however. Dr. Bartollas concluded that "in the structured environment of a prison [Wesson] does very well." Dr.

Bartollas minimized the number of problems Wesson had while he was in prison, concluding that he "is not a threat to anyone in prison * * *."

{¶ 50} Wesson's prison conduct problems included a number of disciplinary infractions for failing to report to work or not obeying an order. He also referred to a corrections officer by an offensive name. His infractions were not limited to verbal or conduct offenses. Wesson also had several violent confrontations with other inmates. Early in his tenure in prison, Wesson stabbed an inmate with a pair of scissors. He was involved in other fights over the course of the 20 years he spent as an inmate. Dr. Bartollas accepted Wesson's belief that these fights arose "out of the on-going tensions of prison life." For example, one of the fights started after an inmate made fun of Wesson's stutter.

{¶ 51} Missing from Dr. Bartollas' report is any explanation of how the tensions of prison life would change for Wesson if he were to serve a life sentence. Wesson would still have the same pressures that caused other fights. His stutter would continue to be a source of frustration for him, and there is no dispute that it was, at least in part, the cause of one fight. Dr. Bartollas specifically noted that "Wesson is small and stutters, and that this would make his survival in prison populations difficult."

{¶ 52} Wesson also argued that trial counsel failed to show that he was a positive force in the prison during the 20 years he was incarcerated. Based on an interview with another inmate, Corbitt Norman, Dr. Bartollas concluded that Wesson had been a positive force in the prison and had helped other inmates. Mr. Norman was Wesson's son-in-law.

{¶ 53} Norman said that Wesson was a positive force in his life in prison—Wesson encouraged him to get an education and learn a trade. He also said that Wesson helped other inmates and was a peacemaker in the prison. Norman "never saw Wesson in a fight because he could talk his way out of anything." On the other hand, Norman also said that he saw Wesson intoxicated from "hooch," an alcoholic drink made in the prison.

{¶ 54} Finally, Dr. Bartollas noted that the prison records demonstrated that Wesson received good work performance evaluations. He specifically pointed to two evaluations that scored him high on a ten-point scale and noted that he "completes his duties with a good attitude." In another portion of his report, however, Dr. Bartollas noted that some of Wesson's disciplinary infractions were for failing to report to work. Another evaluation, not mentioned by Dr. Bartollas, scored Wesson at "5" instead of the higher scores noted on other evaluations.

{¶ 55} There is other information contained in the hundreds of pages of prison records that counsel could have decided they did not want to bring to the trial court's

attention. For example, an Adult Parole Authority report from 1999 includes information about his child endangering conviction. Along with facts about the offense, the report stated that Wesson failed a polygraph test because his responses were deceptive to questions about whether he dropped a baby to the ground and struck the baby in the head. That report included nine pages of prior convictions. Another presentence report from a different case noted that Wesson's "prior adjustment to supervision has been poor."

{¶ 56} As we evaluate the evidence Wesson presented in support of these Grounds for Relief, it is also important to consider Dr. Bartollas' report. The report is five pages long; the first page is in an introduction, citing several of Dr. Bartollas' own publications about prison violence, and the last page contains only the endnotes for the report. The remaining three pages of the report offer a sketch of Wesson's life in prison. By comparison, Dr. Bartollas' vita is 13 pages long. The vita details his extensive and impressive publication record, but it also reveals that the bulk of his work involves juvenile offenders. Wesson, on the other hand, is in his 50s, and would confront a far different prison landscape than a juvenile offender.

{¶ 57} With respect to his first and second grounds for relief, Wesson has argued that he was denied the effective assistance of counsel because "there is no indication that trial counsel had a strategic reason for not utilizing Wesson's prison records." But Wesson has not presented any evidence that counsel did not consider and use his prison records. In fact, Dr. Smalldon testified that he "reviewed an extensive collection of records from the Ohio Department of Rehabilitation and Corrections." The trial court noted that it gave some weight in mitigation to Wesson's lack of bad conduct in prison, even though it also recognized that his previous incarcerations included fighting and refusing orders. The trial court apparently did not hold Wesson's bad conduct against him, and actually gave him some credit in mitigation. Although Wesson acknowledged he "was not perfect in prison," he faults his counsel for not offering his prison records, and the testimony of an expert like Dr. Bartollas, to explain that Wesson could exist peacefully in prison with a life sentence.

{¶ 58} Dr. Bartollas' report, however, can be read to suggest that the same things that caused Wesson to have problems in prison—his size and stuttering—would continue to cause problems in future incarceration. Far from demonstrating ineffective assistance of counsel, the record and evidence Wesson presented with his petition shows that trial counsel managed to present positive mitigation evidence based on Wesson's prior incarceration even though the trial court recognized that Wesson had problems as a prisoner, including some that may have been more serious than the trial court realized. By not focusing on the prison records, trial counsel also did not bring attention to other damaging information that the trial court may have otherwise reviewed.

{¶ 59} Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to the first and second grounds for relief and, accordingly, the trial court did not err in denying relief without a hearing.

*Wesson*, 2012 WL 4480109, at *7-10.

Wesson argues that this decision is an unreasonable application of *Strickland* under § 2254(d)(1), and an unreasonable determination of the facts under § 2254(d)(2). He challenges the state court's finding that he had not "presented any evidence that counsel did not consider and use his prison records." *Wesson*, 2012 WL 4480109, at *10. Wesson asserts that it is evident that counsel did not "use" his prison records because Dr. Smalldon did not testify about them and cite to information contained in them to explain that Wesson had behaved well in the structured environment of prison. (Doc. 46 at 110-12.)

As Respondent argues, however, the state court reasonably determined that counsel had "consider[ed] and use[d]" the records, since Dr. Smalldon testified that he reviewed "an extensive collection of records from the Ohio Department of Rehabilitation and Correction" and offered some positive mitigating evidence about Wesson's incarceration. *Wesson*, 2012 WL 4480109, at *10. In fact, the court noted, the trial court ultimately accorded some weight in mitigation to Wesson's cooperative conduct in jail and the absence of any evidence of bad conduct in prison. *Id*. At the same time, however, the court reasonably concluded, after a careful and thorough examination of the prison records and the post-conviction expert's report, that counsel could have decided not to focus on this evidence because it would have drawn attention to damaging information contained in the records. *See Campbell v. Bradshaw*, 674 F.3d 578, 592 (6th Cir. 2012) ("[M]itigating value must be weighed against the potential harm its introduction might have done."). The court observed that Wesson's prison records contained

70

nine pages of prior convictions, including a child endangering conviction, and information about Wesson's significant problems in prison, including several disciplinary infractions and violent fights with inmates. *Wesson*, 2012 WL 4480109, at *9.*

Accordingly, the state appellate court's decision that Wesson's counsel did not provide ineffective assistance in failing to present his prison records or a prison expert as mitigating evidence was not contrary to, or an unreasonable application of, *Strickland*, and was not based on an unreasonable determination of the facts in light of the evidence presented.

### b. lay witnesses who knew Wesson throughout his life

Wesson further claims that counsel should have presented at the mitigation phase of trial the following lay witnesses, who could have testified about Wesson's "upbringing, family and life": Wesson's cousins Herb Wesson and Deborah Wells; Wesson's former employer, Edgar Lee; Wesson's son-in-law and former fellow inmate, Corbitt Norman; Wesson's maternal second cousin, Sharon Clark; and Wesson's paternal cousins, Randall Wesson and Stephen Wesson. (Doc. 46 at 122.)

Wesson raised ineffective-assistance claims relating to Herb Wesson, Edgar Lee, Deborah Wells, and Corbitt Norman in his first state post-conviction petition. The last state court to review the claim, the court of appeals, addressed the merits of the claims, reasoning:

{¶ 64} In these four grounds for relief, Wesson complained that trial counsel were ineffective for failing to present evidence of Wayne Wesson's criminal records and to call three witnesses: his cousin Herb Wesson, his past-employer Edgar Lee, and his cousin Deborah Wells. According to Wesson, trial counsel should have presented this evidence to show a clearer picture of his background.

{¶ 65} To put this argument in context, it is important to first review the evidence that trial counsel presented through Wesson's sister, Yvette Wesson. Ms. Wesson was born two years before Wesson. She was born in Cleveland Ohio, Wesson was born two years later in Detroit, Michigan, and their younger brother, Wayne Wesson,

was born in Cleveland three years after that. Their parents, Barbara Wesson and Hersie Wesson, Sr., moved from Cleveland to Detroit, and back to Cleveland, because of job changes. During these years, Mr. and Mrs. Wesson drank excessive amounts of alcohol, including when Mrs. Wesson was pregnant with the children. Ms. Wesson believed that both of her parents were alcoholics.

{¶ 66} Ms. Wesson told several tragic stories about their childhood. For example, while living in Detroit, just a few months after Wesson was born, Mrs. Wesson and her mother, who was visiting from Cleveland, wanted to go out to a club. Ms. Wesson was taking care of Wesson during this time because of the alcoholism in the family. Ms. Wesson's grandmother said they did not need to get a babysitter and, instead, she poured gin in Wesson's bottle and gave it to him to drink. She also gave Ms. Wesson a bottle of beer to drink. Ms. Wesson's mother and grandmother then gave the children pillows and blankets, locked them in a closet, and left for the clubs. Ms. Wesson and Wesson sat in the closet while he cried. Wesson eventually drank the bottle and she feared that he had died.

{¶ 67} When Wesson was about a year old, he suffered a serious injury. A relative, who was drunk at the time, was carrying him while walking up stairs. She slipped and they both fell all the way to the bottom of the stairs. Ms. Wesson, who was also knocked down, recalled that Wesson was unconscious and his head was cracked open and bloody. He was not taken to the hospital.

{¶ 68} When the family returned to Cleveland, Mr. Wesson was bedridden because of a back injury. Mrs. Wesson worked two jobs and was rarely home to supervise the children. And both parents continued to drink alcohol during this time, perhaps even more than before.

{¶ 69} Mr. Wesson was an abusive father, especially when he was drunk, which was most of the time. He would beat the kids if they came home late from school or if he did not approve of their appearance. He would hit them "with razor straps, slats from underneath the bed to hold the mattress up, electric cords, belts, switches with knots tied in them. I guess whatever was available."

{¶ 70} One of the things that particularly upset Mr. Wesson was Wesson's stutter. Mr. Wesson would tell Wesson that he was not his child and beat him. Mr. Wesson's beatings would happen at least once a day. After some time, the family's home caught fire and was completely destroyed. The family moved in with Mr. Wesson's mother in Cleveland. After several months, Wesson moved to live with a cousin and Ms. Wesson moved to live with a different cousin. Later, Mr. Wesson moved to Tennessee, Mrs. Wesson began living with a man named Mr. Marino, and the kids moved back to live with their mother.

{¶ 71} Mr. Marino also drank, although not as much, and was violent. Mrs. Wesson and Mr. Marino argued in front of the children. In one incident, Mr. Marino threw Mrs. Wesson in a bathtub, beat her, and threw glasses at her. Wesson and Ms. Wesson tried to fight him off. The violence continued for some time and Mrs. Wesson suffered numerous injuries, including several miscarriages, as a result of the beatings.

{¶ 72} As Ms. Wesson grew older, she also grew more defiant. She finally put her foot down and told her father to stop beating her brothers. Mr. Wesson focused his beating on her instead, but still continued to hit Wesson.

{¶ 73} Eventually the family moved to Akron to live with Mrs. Wesson's mother, Mrs. Williams. Mrs. Williams ran a restaurant. She was also an alcoholic and physically abusive toward Wesson. Mrs. Williams' brother, Eugene, intervened and protected the kids from the abuse. Ms. Wesson moved to Cleveland when she was about 14 years old. Wesson and his brother remained in Akron and, thanks to Eugene, the situation got better for them.

{¶ 74} Wesson had his share of other injuries, starting with the fall down the steps when he was about a year old. When he was about 15 years old, he was robbed. He was badly injured—he was beaten and cut in several places, including the back of his head. He also had an argument with his younger brother that escalated until Wayne Wesson hit Wesson over the head with a large glass bowl that Ms. Wesson guessed weighed about 40 pounds.

{¶ 75} When Ms. Wesson was about 18, she moved to California. She fought to have Wesson move to California and, when he was about 18, he also moved to live with her. Within a day, however, Wesson was homesick and he returned to Ohio to live with his mother.

{¶ 76} Ms. Wesson provided this detailed testimony about the formative years she spent with her brothers. The trial court found her to be credible, and, as noted above, the trial court's findings of fact were supported by competent and credible evidence. Her testimony painted a picture of a young life filled with alcohol, violence, poverty, and chaos. "Chaos" was also a word Dr. Smalldon used to describe Wesson's life.

{¶ 77} With that background, we now consider the other evidence and witnesses Wesson now claims should have been presented at his mitigation hearing.

* * *

*Herb Wesson's Testimony*

{¶ 82} Wesson argued that trial counsel were ineffective for failing to call Herb Wesson to testify at his trial. Herb Wesson was a cousin of the Wesson siblings. The trial court concluded that the cousin's testimony would not have added anything to the testimony of Wesson's sister.

{¶ 83} Wesson asserted that "[a] failure to provide a sentencer with additional mitigation is not a reasonable strategic decision." This position is contrary to the Supreme Court's conclusion that trial "counsel's decision not to call additional family members as mitigation witnesses was a 'tactical choice' and did not result in ineffective assistance of counsel." *Hand*, 2006–Ohio–18, at ¶ 241; *see, also, Elmore*, 111 Ohio St.3d 515, 2006–Ohio–6207, at ¶ 116. The United States Supreme Court has also rejected the " 'more-evidence-is-better' approach" where offering additional evidence could have resulted in the sentencer hearing other evidence that trial counsel, for tactical reasons, did not want the jury to hear. *Wong* at 389.

{¶ 84} As for the cousin's testimony, Wesson argued that, "[a]s someone outside the family, Herb Wesson would have provided the panel with a different perspective of Wesson's upbringing." Specifically, the cousin could have testified that Wesson lived in a chaotic home where he learned bad behaviors. According to Wesson, this would have shown that the harmful home environment was apparent even to an outsider.

{¶ 85} The cousin's testimony, recounting observations from a distance, would not have been superior to the testimony given by Ms. Wesson and the history recounted by Dr. Smalldon. The trial court found Ms. Wesson to be a credible witness. She testified to a horrible home life based on her personal experiences. Trial counsel were not ineffective for not buttressing this testimony with evidence from a cousin who had some recollections of Wesson's bad home life. *See Hand* at ¶ 241. This evidence "would barely have altered the sentencing profile presented to the sentencing judge[s]." *Strickland*, 466 U.S. at 700. Accordingly, Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his sixth ground for relief.

*Edgar Lee's Testimony*

{¶ 86} Wesson argued that trial counsel were ineffective for failing to present the testimony of Edgar Lee. Mr. Lee hired Wesson to do odd-jobs for him. According to Mr. Lee's affidavit, Wesson worked for him for a few months in 2007. Mr. Lee found Wesson to be a good, reliable worker.

{¶ 87} Wesson asserted that Mr. Lee's testimony was significant. According to Wesson, Mr. Lee's testimony about Wesson's part-time work for him over a few months would have been substantial enough to allow the trial court to create a positive image of Wesson as an adult. But the trial court heard this evidence through Dr. Smalldon. He testified that Wesson "had lost the job that he had for a number of

months in 2007, which for him was a significant source of self-worth." Dr. Smalldon also told the trial court that Wesson was frustrated when he lost the ability to contribute to paying bills.

{¶ 88} The trial court concluded that it was reasonable to assume that trial counsel did not consider a temporary, part-time, employer's testimony to be relevant or compelling. Counsels' decision whether to call a witness "falls within the rubric of trial strategy * * *." *State v. Were,* 118 Ohio St.3d 448, 2008–Ohio–2762, ¶ 222. Wesson's attorneys were "entitled to be selective" when deciding which witnesses to call and, again, this evidence would not have altered the sentencing profile. *Id.* After reviewing the evidence, and Wesson's argument, we agree with the trial court's conclusion. Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his seventh ground for relief.

### Deborah Wells' testimony

{¶ 89} Wesson argued that trial counsel should have called Deborah Wells to testify. Ms. Wells is Wesson's cousin. Like Herb Wesson, discussed above, Ms. Wells' testimony would not have added anything to the testimony of Wesson's sister. Postconviction counsel have characterized Ms. Wesson's testimony as lacking credibility and self-serving. Regardless of how postconviction counsel viewed her testimony, the trial court found her to be credible. Ms. Wells' testimony would have been less detailed, but otherwise cumulative, to Ms. Wesson's testimony. Trial counsel could have reasonably decided to focus on Ms. Wesson's testimony that described a life shattered by alcohol, physical, and mental abuse, rather than diluting Wesson's history with the testimony of a cousin with whom Wesson sometimes stayed, but who did not have constant contact or interaction with him. *See, e.g., Were* at 222.

{¶ 90} We conclude here, as we did with Wesson's other cousin, that trial counsel were not ineffective because they did not present her testimony in mitigation. Accordingly, Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his twelfth ground for relief.

{¶ 91} Wesson has not demonstrated that he was denied the effective assistance of counsel as alleged in his fifth, sixth, seventh, and twelfth grounds for relief. Accordingly, the trial court did not abuse its discretion in dismissing the petition without a hearing.

* * *

### [Corbitt Norman's testimony]

{¶ 60} Along the same lines, Wesson's third ground for relief specifically challenged trial counsel's failure to call Norman, mentioned above, to testify at the mitigation hearing. Wesson argues that Norman could have testified about Wesson's adaptability to prison.

{¶ 61} The facts in Norman's affidavit would not have added substantially to the evidence presented to the trial court. It appears that Wesson sought out Norman because Norman was his son-in-law. As noted above, Wesson encouraged him to get an education. Norman also swore he never saw Wesson in a fight because he "could talk his way out of anything." This assertion is countered by the undisputed evidence that Wesson was involved in fights in prison and, because of the stuttering that embarrassed him, it appears contradictory that he could talk his way out of anything. Norman's affidavit also contains damaging evidence that Wesson was drunk while in prison after drinking hooch, a fact the sentencing panel apparently did not have before it.

{¶ 62} Norman's affidavit offers some positive, and some negative, evidence about Wesson's adaptability to prison. The key point, however, is that the trial court found some evidence in mitigation because of Wesson's conduct in prison. There is nothing in Norman's affidavit that would have tilted the scale any further in Wesson's favor. Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to the third ground for relief.

*Wesson*, 2012 WL 4480109, at *10-15.

Wesson does not provide any argument that the state court's decision on these claims satisfies AEDPA's § 2254(d). And even if he did, they would fail. The state court reasonably found that Wesson's trial counsel conducted an adequate investigation into Wesson's background and childhood, and presented credible and powerful testimony about Wesson's past through his sister and Dr. Smalldon. The court thoroughly summarized his sister's "detailed testimony" that "painted a picture of a young life filled with alcohol, violence, poverty, and chaos." *Wesson*, 2012 WL 4480109, at *13. And it emphasized that "the trial court found her to be credible," and its "findings of fact were supported by competent and credible evidence." *Id*. As noted above, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a

strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters,* 46 F.3d at 1512.

Moreover, the state court reasonably concluded that the witnesses Wesson now claims counsel should have presented at his mitigation hearing "would not have added anything to the testimony of Wesson's sister." *Id.* at *14. Wesson, therefore, cannot show that he was prejudiced by counsel's failure to present the additional witnesses, as their testimony would have been cumulative to what was presented at trial. *See, e.g., Eley v. Bagley*, 604 F.3d 958, 968 (6th Cir. 2010) ("[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.") (quotation marks and citation omitted).

Wesson asserts that the testimony of these witnesses would "differ markedly" from the testimony presented at trial because they would have provided "antidotal information regarding Wesson's upbringing that was not presented through Dr. Smalldon or Yvette Wesson's testimony at the mitigation hearing." (Doc. 46 at 123.) But that is not enough to establish that Wesson was prejudiced by its omission. The Court has reviewed the additional testimony Wesson now promotes – including that of Sharon Clarke, and Randall and Stephen Wesson, upon which Wesson based claims in his second post-conviction petition – and finds it provides additional and varied information about Wesson's alcoholic parents, chaotic family life, stuttering condition, physical injuries, and low intellectual abilities. But this testimony would not differ materially enough from what was presented at trial to establish that Wesson was prejudiced by counsel's failure to present it. *See , e.g., Hill v. Mitchell*, 400 F.3d 308, 332 (6th Cir. 2005) (finding the petitioner "present[ed] additional detail about his family background as

well as a number of positive statements about his character and how he loved his mother and would not have killed her but for the influence of cocaine[, b]ut nothing in this new testimony differs markedly from the testimony and evidence the jury in fact considered and above all does not differ in such a material way as to establish that [the petitioner] was prejudiced by the omission of this testimony"); *Johnson v. Bell*, 344 F.3d 567, 574 (6th Cir. 2003) (finding no prejudice in failure to present testimony by defendant's family members, even though it would have humanized him by showing he had been a good son, brother and parent, because the evidence fell short of the quantum of evidence required to show prejudice).

The state appellate court's decision rejecting this ineffective-assistance claim on initial post-conviction review, therefore, neither contravened nor unreasonably applied *Strickland*, and this claim as presented in Wesson's second post-conviction petition lacks merit.

### c.      Wayne Wesson's criminal record

Wesson also complains that his trial attorneys failed to present the criminal records of his brother Wayne, as they resembled his own, and would have confirmed "that growing up in the Wesson household had a profound effect on the Wesson children, and it was not just Hersie Wesson who struggled."  (Doc. 46 at 113.)

The state court of appeals addressed this claim in Wesson's first post-conviction proceedings, stating:

{¶ 78} Wayne Wesson is Wesson's younger brother. Wesson, his sister, and brother, lived through the same difficult conditions as children. Ms. Wesson has no criminal record, as noted by the State during the trial. Wesson, as outlined above, has an extensive criminal record. He has argued that evidence of his brother's criminal

record should have been introduced to show that, unlike his sister, his brother does have a criminal record. According to Wesson, this would have weakened the State's argument that Ms. Wesson lived through the same events as Wesson but she does not have a criminal record.

{¶ 79} At the trial, the State pointed out that many people grew up in abusive homes. It pointed to Ms. Wesson as an example of someone who lived through that experience without turning to a life of crime. Wesson argued in his petition that trial counsel were ineffective for failing to present his brother's criminal record to counter his sister's lack of a criminal record. Among the many exhibits he filed with his petition, he did not include an affidavit from his brother. The petition relied on print-outs of numerous on-line criminal dockets showing that Wesson's brother had a lengthy criminal record. The trial court concluded that evidence of Wayne Wesson's criminal record would not have made a difference in its decision because both of Wesson's siblings lived through similar abusive childhoods, but only Wesson had killed someone. Although Wesson criticizes this reasoning, the trial court was correct. *See Wong v. Belmontes*, 558 U.S. 15, 130 S.Ct. 383, 386 (in evaluating defendant's claim, it is necessary to consider all of the relevant evidence the trial court would have had before it if trial counsel had sought to introduce it.). The records would have highlighted that three people lived through similar abusive childhoods and that only Wesson killed someone.

{¶ 80} The petition for postconviction relief did not include an affidavit from Wayne Wesson to explain anything about his past or his criminal record. There was nothing to certify the on-line printouts as accurate representations of his criminal record or to demonstrate that the defendant was in fact Wesson's brother. It is mere speculation to claim that introducing these records would have had any impact on the trial court. *See, e.g., State v. Elmore*, 111 Ohio St.3d 515, 2006–Ohio–6207, ¶ 121.

{¶ 81} Wesson has not demonstrated that he was denied the effective assistance of counsel as it relates to his fifth ground for relief.

*Wesson*, 2012 WL 4480109, at *13-14.

Wesson argues that the state court unreasonably applied *Strickland* in concluding that counsel did not perform deficiently in deciding not to present his brother's criminal records because they would have highlighted that the three Wesson siblings lived through similar circumstances but only Wesson killed someone. (Doc. 46 at 113.) He counters that his "exact circumstances" were different, and "his limitations left him unable to overcome the effects of his

childhood." (*Id*.) But that argument contradicts Wesson's very premise for claiming his counsel should have introduced this evidence – to demonstrate that, unlike his sister, the siblings' shared childhood also had an adverse impact on his brother. The state court reasonably concluded Wesson had not shown that this unauthenticated information would have impacted the sentencing decision of the trial court, and its decision neither contravened nor unreasonably applied *Strickland*.

### d. Wesson's efforts to redeem himself

Wesson also faults his trial counsel for failing to investigate and present mitigating evidence concerning his "efforts to redeem himself," as reported in records from a mental health agency at which he received care from September 2007 to January 2008. (Doc. 46 at 131-32.) He raised this claim in his second post-conviction petition, which was rejected on procedural grounds. This Court's review, therefore, is *de novo*.

Wesson argues that after he was released from prison in the fall of 2007, he "tried to become a productive member of society." (*Id*. at 131.) He cites the report of his post-conviction expert, Dennis Eshbaugh, to demonstrate that during this time, he first attended counseling sessions regularly and "actively participated" in therapy; was successful in abstaining from alcohol for "a period of time" even though he began to experience depression, anxiety, crying spells, and poor sleep; but relapsed in January 2008, after having trouble finding employment. (*Id*. (citing Doc. 12-14 at 55 (Eshbaugh Rpt.).) Wesson last attended therapy in mid-January 2008, a little more than a month before the crime. (*Id*.)

Respondent contends that Wesson's trial counsel had these records because Dr. Smalldon referenced them in his trial testimony. (Doc. 43 at 63 (citing Doc. 13-26 (Trial Tr.) at 90.) And

80

counsel could well have decided not to emphasize Wesson's "redemptive efforts" efforts to seek psychological therapy and achieve sobriety, Respondent maintains, "in view of their obvious failure." (*Id.*) The Court agrees. As noted above, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough,* 540 U.S. at 8.

This sub-claim, too, lacks merit.

### e. the link between Wesson's limitations and crimes

Wesson further claims that trial counsel were ineffective for not presenting expert testimony about the link between his limitations and the crime. (Doc 46 at 59-61.) Wesson asserted this claim in his first post-conviction petition, and it was adjudicated on its merits. The last state court to review the claim, the state appellate court, reasoned:

{¶ 92} Wesson argued that trial counsel were ineffective because they did not "ensure that the mitigation expert presented a complete picture of Wesson's mental and emotional problems and development." He further contended that Dr. Smalldon "failed to establish a nexus between Wesson's various mental health issues and the crime." He criticized Dr. Smalldon's testimony because Dr. Smalldon "damaged his credibility with the sentencing panel when he downplayed Wesson's diagnosis of Antisocial Personality Disorder." Wesson tied these problems to his counsel by arguing that they were ineffective because they did not adequately research and screen their expert. Wesson complained that his counsel could not "merely hire a mitigation expert and then hope that the expert performs adequately." After our review of the record, we conclude that Wesson failed to present any evidence to show that his trial counsel were ineffective.

{¶ 93} Dr. Smalldon testified at length at the mitigation hearing. His testimony covered almost 100 pages of the transcript. He testified that he began his consultation on this case in April 2008, almost a year before he testified. He met with Wesson three times for a total of about 15 hours. He also worked in conjunction with a mitigation specialist hired by trial counsel. The mitigation specialist gathered background information about Wesson and shared it with Dr. Smalldon.

{¶ 94} Dr. Smalldon recounted all of the documents he reviewed, including Wesson's extensive collection of records from the Ohio Department of Rehabilitation and

Corrections, the facility where Wesson was held when he was a juvenile, the Akron City Schools, the Adult Parole Authority, and the mental health agency where he was a client before he murdered Mr. Varhola. He and the mitigation specialist also met with trial counsel and interviewed witnesses over the months he spent preparing for trial and a possible mitigation hearing.

{¶ 95} Wesson's argument focused on one narrow criticism: that trial counsel did not adequately prepare Dr. Smalldon to testify about Wesson's antisocial personality disorder. He ignored the remainder of Dr. Smalldon's testimony. For example, Dr. Smalldon testified about Wesson's positive interactions with the deputies in the jail during his visits. He testified at length about Wesson's prenatal exposure to alcohol and how that affected Wesson's development. He explained the difference between fetal alcohol syndrome and fetal alcohol effect and highlighted the deficits that stem from fetal alcohol effect, including an inability to assess consequences of behavior and inability to respond appropriately to subtle social and personal cues. He noted three other findings for people suffering from fetal alcohol effect—stuttering, impulsivity, and low frustration tolerance. Dr. Smalldon said that all of these things were consistent with what he learned about Wesson.

{¶ 96} Dr. Smalldon testified about Wesson's life as a child and young adult. He focused on the physical abuse Wesson observed and suffered. Dr. Smalldon said that children like Wesson, who have witnessed violence between significant people in their lives, are at a greater risk for engaging in violent behavior as adults.

{¶ 97} Dr. Smalldon also explained what he learned about Wesson's numerous head injuries. He described four different head injuries that resulted in Wesson losing consciousness. He explained that these are significant events because head injuries frequently result in behavioral problems, including impulsivity, poor self-regulation, and poor judgment. Dr. Smalldon was not able to precisely determine the extent of the injuries Wesson suffered because Wesson refused to participate in full neuropsychological testing.

{¶ 98} Dr. Smalldon did administer a number of psychological tests. The results showed that he was functioning on an elementary school level and that he had a low IQ. Although Dr. Smalldon was not able to conduct a complete battery of neuropsychological tests, the results from the tests he administered were consistent with someone who suffered from a brain injury.

{¶ 99} Dr. Smalldon reviewed more of Wesson's life history, including his alcohol problems and his difficult relationships with many different women. He told the trial court that Wesson's brief employment in 2007, the job Edgar Lee would have testified about, was a source of self-worth to Wesson.

{¶ 100} Based on all of the information Dr. Smalldon collected, he presented the trial court with a diagnosis. Dr. Smalldon testified to Wesson's multi-part diagnosis, which included (1) depressive disorder, not otherwise specified, (2) borderline intellectual functioning, (3) alcohol dependence, and (4) a personality disorder not otherwise specified with passive aggressive, narcissistic, and anti-social features. Dr. Smalldon explained each of these in some detail, including the personality disorder that is the basis of this ground for relief.

{¶ 101} Wesson complained that Dr. Smalldon damaged his own credibility, and counsel failed to adequately prepare him, when Dr. Smalldon testified that "anti-social, it just refers to a long pattern of rule-breaking behavior." There is no question that Dr. Smalldon made that statement, but it came at the end of six pages of discussion about Wesson's anti-social personality disorder, which he characterized as having "passive-aggressive, narcissistic, and antisocial features." At the beginning of his testimony, Dr. Smalldon said that a personality disorder "refers to a very deep-seated enduring pattern of behavior that has resulted in either a very significant subjective distress or caused the individual major problems across the different dimensions of their life, relational, vocational, so on." He continued that "it refers to a very deeply-rooted personality dysfunction by definition [with] roots that go back into the person's developmental history."

{¶ 102} Wesson presented a report by Dr. Dennis M. Eshbaugh in support of this ground for relief. Dr. Eshbaugh's Mitigation Review report set out an overview of what happened at trial, what Dr. Eshbaugh learned from a three-hour meeting with Wesson after he was sentenced, and an evaluation of Dr. Smalldon's performance at the mitigation hearing. Dr. Eshbaugh complimented Dr. Smalldon's professional experience and concluded that it was clear Dr. Smalldon "was very familiar with Mr. Wesson's history and mental status. He was adept in highlighting the difficulties Mr. Wesson has had throughout his life."

{¶ 103} Dr. Eshbaugh wrote in his report that he believed Wesson's history clearly indicated antisocial personality disorder and that it should have been presented directly. He also thought that Dr. Smalldon focused too much on Wesson's brain injuries without sufficient evidence to prove that he had ever actually suffered an injury. Dr. Eshbaugh spent several pages in his report explaining why he thought it would have been important to focus more on the antisocial personality diagnosis. He did not disagree with Dr. Smalldon's other diagnoses.

{¶ 104} Dr. Eshbaugh concluded that Wesson made a choice in causing the death of Mr. Varhola and assaulting Mrs. Varhola, but he did not have a choice in the circumstances that led to his behavior in the offenses. According to Dr. Eshbaugh, Wesson's antisocial personality disorder, alcoholism, violence, and limited intellectual capacity were dictated by his family, both genetically and environmentally. His stressors at the time he committed the murder were beyond his

ability to manage. At the mitigation hearing, Dr. Smalldon reached a similar conclusion. He concluded that Wesson could not act appropriately because of his impulsivity, inability to think about consequences, personality-related factors, limited intellectual ability, and alcoholism.

{¶ 105} Dr. Smalldon and Dr. Eshbaugh reached the same conclusions. Dr. Eshbaugh agreed with Dr. Smalldon's diagnoses. Dr. Eshbaugh described the mitigation evidence as "quite typical." Dr. Eshbaugh had one advantage that Dr. Smalldon did not, however. Dr. Eshbaugh had the benefit of hindsight to see that the trial court was not convinced that evidence of Wesson's brain injuries was substantial enough to mitigate his sentence.

{¶ 106} Dr. Eshbaugh wrote in his report that he would have highlighted the antisocial personality diagnosis and what that meant for Wesson's conduct. While that may have been one approach, it was certainly not the only approach. In fact, at least one court has characterized evidence of antisocial personality disorder as "not 'good' mitigation" evidence. (Internal quotations omitted) *Morton*, 684 F.3d at 1168. The defendant in Morton argued that his attorneys were ineffective because they called a doctor to testify about his antisocial personality disorder, which he described as "no more mitigating than being 'evil' is mitigating." *Id*. at 1167–68. The Eleventh Circuit disagreed, noting that his attorneys chose a mitigation strategy that many lawyers argue is effective. *Id.* at 1168.

{¶ 107} The Ohio Supreme Court has also considered mitigation evidence about antisocial personality disorder. *See, e .g., State v. Campbell*, 95 Ohio St.3d 48, 57 (2002). In Campbell, another case in which Dr. Smalldon testified, the Supreme Court considered Dr. Smalldon's testimony about antisocial personality disorder. Dr. Smalldon testified in that case that many people with this disorder "function in society and do not commit crimes," an argument similar to the one the prosecutor made in this case. *Id.* The Ohio Supreme Court concluded that the defendant's "antisocial personality disorder deserves little weight [in mitigation]." *Id. See, e.g.*, *State v. Jackson*, 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 175 (Court gave little weight to this disorder and cited other cases reaching the same result).

{¶ 108} Dr. Smalldon and Dr. Eshbaugh reached the same diagnoses and conclusions. Trial counsel opted to present evidence of Wesson's four significant brain injuries and evidence of his antisocial personality disorder. Postconviction counsel have argued that trial counsel should have focused more on antisocial personality disorder and Dr. Eshbaugh wrote that he would have minimized his reliance on Wesson's undocumented brain injuries. There may be reasonable justifications for both approaches, but several decisions have concluded that evidence of antisocial personality disorder is of limited value in mitigation. In addition, hindsight cannot affect the evaluation of the performance of trial counsel. Just because trial counsels' approach turned out to be unsuccessful does not mean

that they provided ineffective assistance of counsel. Trial counsels' approach presented the trial court with valuable mitigation evidence without focusing on the antisocial personality disorder evidence. Because the Ohio Supreme Court has routinely concluded that this evidence deserves little weight in mitigation, trial counsels' strategy did not deprive Wesson of the effective assistance of counsel.

{¶ 109} Wesson has not demonstrated that he was denied the effective assistance of counsel as alleged in his fourth ground for relief. Accordingly, the trial court did not abuse its discretion in dismissing the petition without a hearing.

*Wesson*, 2012 WL 4480109, at *15-19.

Wesson argues that the state court made an unreasonable determination of the facts under AEDPA's § 2254(d)(2) when it found that Dr. Smalldon and Dr. Eshbaugh "reached the same diagnoses and conclusions." (Doc. 46 at 118 (citing *Wesson*, 2012 WL 4480109, at *18).) He does not allege the court mischaracterized either experts' conclusions. Rather, he contends the court "failed to note how the doctors' testimony differed." (*Id.*) Where Dr. Eshbaugh "delved into detail regarding the ways that Wesson's defects contributed to his involvement and perception of the crime," Wesson asserts, Dr. Smalldon "gave no further explanation of how [Wesson's limitations] specifically contributed to Wesson's involvement in the instant offense . . . [or] would have affected Wesson's perception of any potential threat against him." (*Id.*)

A review of Dr. Smalldon's testimony, however, shows that Dr. Smalldon did, in fact, describe how Wesson's mental health problems led to his criminal conduct. He testified that "[Wesson is] emotionally very reactive, he's impulsive. He doesn't anticipate or think about the consequences of what he's doing, particularly when alcohol is involved." (Doc. 13-26 (Trial Tr.) at 141.) He then explained the impact of those characteristics on Wesson's behavior, including reaction to perceived threats and criminal behavior, opining:

> The personality characteristics that I mentioned make him very vulnerable to overreacting to things that he perceives as slights or challenges to his very fragile

> sense of personal competence, and in that sense I certainly think that all of those factors, the limited intellectual ability, the role of alcohol, the underlying depression, and the personality-related factors, can combine to compromise his ability to conform his conduct to the requirements of the law.

(*Id*. at 141-42.) As the state court observed, Dr. Smalldon concluded that "Wesson could not act appropriately because of his impulsivity, inability to think about consequences, personality-related factors, limited intellectual ability, and alcoholism." *Wesson*, 2012 WL 4480109, at *18. The fact that Dr. Eshbaugh emphasized certain points more or provided more detail that Wesson now finds helpful mitigating evidence, does not render the state court's finding that Dr. Eshbaugh reached a similar conclusion to Dr. Smalldon unreasonable.

Moreover, as Respondent argues, counsel were not ineffective in retaining or preparing an expert just because the petitioner, in hindsight, believes the expert could have testified in a sightly different manner. The Sixth Circuit has explained,

> To the extent that Petitioner's argument can be framed as one impugning the competency of the psychologists retained to assist trial counsel, Petitioner's argument has little merit. The Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available.

*Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006) (citing *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)).

The state appellate court's decision, therefore, was not based on an unreasonable determination of fact in light of the evidence presented, and this claim fails.

### f.     fetal alcohol spectrum disorder

Finally, Wesson complains that his trial counsel should have presented a mitigation expert on fetal alcohol spectrum disorder ("FASD"). (Doc. 46 at 127-31.) He acknowledges that Dr. Smalldon presented testimony on this topic. (*Id*. at 128.) But he argues that the expert

did not diagnose Wesson with FASD and "did not *appl*[y] and *connect*[] FASD to Wesson and his crime." (*Id*. at 129 (emphasis in original).)

Dr. Smalldon testified at length about FASD at Wesson's trial. Early in his testimony, he stated his opinion that FASD was a "prenatal risk factor[] that may have affected Hersie's development." (Doc. 13-26 (Trial Tr.) at 95-96.) He explained that although Wesson's mother was deceased, family members had told him that she was a "serious alcoholic" and would have exposed Wesson to alcohol during her pregnancy with him. (*Id*. at 96.) He described FASD and testified that "[i]t's well known that prenatal exposure to alcohol is the single greatest contributor to mental retardation." (*Id*. at 97.)

Dr. Smalldon further testified that he could not render a diagnosis of FASD because he did not obtain sufficient information to do so, but "fe[lt] very confident that [Wesson] was exposed to alcohol prenatally and it would be appropriate to describe the effects of that exposure as fetal alcohol effect." (*Id*.) He then provided a detailed analysis of the "kinds of effects that [were] evident because of fetal alcohol effect." (*Id*. at 97-98.) He explained that individuals with fetal alcohol effect often exhibit the same neuro-cognitive, or intellectual, type of deficits as those with "full" FASD. (*Id*. at 98.) Those deficits include: inability to assess consequences of behavior; inability to respond appropriately to subtle social and personal cues; inadequate initiative; poor expressive language skills and language comprehension; stuttering; impulsivity; and low frustration tolerance. (*Id*. at 98-99.) He testified that these symptoms were "consistent with [Wesson's] history." (*Id*. at 99.)

Dr. Smalldon later testified about the role of Wesson's fetal alcohol effect in his mental and emotional development, stating that it had

contribute[d] to the formation of personality dysfunction of the kind [he had] diagnosed Mr. Wesson with because they add another risk factor that often plays a major role in the person's adaptation to his or her life circumstances.

Someone without those predisposing vulnerabilities, because of the early alcohol exposure, might not respond to developmental stressors in the same way as someone who did have that exposure would.

So, it can certainly contribute.

(*Id*. at 135.)  Dr. Smalldon specified that he viewed fetal alcohol effect as "a risk factor that can play a role in how the individual responds to developmental stressors, and how the individual responds to some of those things in childhood are what we're talking about when we talk about how a personality disorder develops over time."  (*Id*. at 136.)  He agreed that this condition also may have been related to Wesson's other diagnoses of limited intellectual functioning, alcoholism, and depression.  (*Id*.)

On cross-examination, Dr. Smalldon again emphasized that "individuals who are diagnosed with fetal alcohol effect demonstrate about the same level of impairment as individuals who are diagnosed with fetal alcohol syndrome."  (*Id*. at 160-61.)

Thus, Dr. Smalldon did not diagnose Wesson with FASD because he had insufficient information to do so, but he did diagnose him with fetal alcohol effect, which he stressed caused the same degree of impairment.  He also made it clear that the fetal alcohol effect contributed to the development of Wesson's other mental health problems.  Based on that record, Wesson cannot demonstrate that his counsel's failure to retain and present an expert on FASD so prejudiced him that the result of the panel's sentencing would have been different.  This claim, too, fails.

## III.      Fourth Ground for Relief:  *Intellectual Disability*

88

Wesson asserts in his fourth ground for relief that he is intellectually disabled and therefore ineligible for execution under the Eighth Amendment pursuant to the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002).[9] Respondent argues that this claim is procedurally defaulted because Wesson first raised it in a second-in-time post-conviction petition that the state courts denied as untimely and successive. (Doc. 43 at 66-69.) Wesson concedes he defaulted his *Atkins* claim but argues that the default should be excused, either for cause – namely, his trial and post-conviction counsel's failure to raise the claim – or because there will be a "fundamental miscarriage of justice" if the claim is not considered. (Doc. 46 at 119-22.) He requests an evidentiary hearing on the procedural issues. (Doc. 47.) Respondent opposes that motion. (Doc. 48.)

### A.    *Atkins v. Virginia* and the Definition of Intellectual Disability

In the 2002 decision *Atkins v. Virginia*, the Supreme Court held that in light of "our evolving standards of decency," executing an intellectually disabled offender violates the Eighth Amendment's ban on cruel and unusual punishments. *Atkins*, 536 U.S. at 321. The Court recognized a national consensus that intellectually disabled persons are "categorically less culpable than the average criminal." *Id.* at 316. It explained,

---

[9] The Court will use the term "intellectual disability" in place of "mental retardation" in this opinion unless it appears in quoted text. The designation intellectually disabled, or "ID," is now widely used by the medical community, educators and others, since the label mentally retarded has long carried a painful stigma. The terms are synonymous. *See* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* 12 (11th ed. 2010) ("[T]he term ID covers the same population of individuals who were diagnosed previously with mental retardation."); *Hall v. Florida*, 572 U.S. 701, 704-05 (2014).

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id*. at 318.

The *Atkins* Court also found that intellectually disabled offenders are at "special risk of wrongful execution." *Id*. at 320. It pointed to the possibility of false confessions; the defendant's difficulty in persuasively showing mitigation, providing meaningful assistance to counsel, and testifying; and his or her demeanor, which may create an unwarranted impression of lack of remorse. *Id*. at 320-21. Given their impairments, the Court concluded, executing the intellectually disabled would not "measurably advance the deterrent or the retributive purpose of the death penalty." *Id*. at 321.

The Court acknowledged in *Atkins*, however, that intellectual disability is difficult to define. "To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded," the Court noted. *Id*. at 317. "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id*. Consequently, as it did in the context of mental competency, the Court entrusted the states with "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id*. (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

The Court provided some guidance, however.  It cited to the clinical definitions of intellectual disability promulgated by the leading psychiatric medical associations, the American Association on Mental Retardation ("AAMR"), now called the American Association on Intellectual and Developmental Disabilities ("AAIDD"), and the American Psychiatric Association ("APA").  *Id*. at 308 n.3 (citing AAMR, *Mental Retardation:  Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) (hereinafter, "AAMR-9") and APA, *Diagnostic and Statistical Manual of Mental Disorders* 41-43 (4th ed. 2000) (hereinafter, "DSM-4")).  Those criteria, it explained, "require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."  *Id*. at 318.  Existing state statutory definitions of intellectual disability, it observed, "are not identical, but generally conform to [those] clinical definitions . . . ."[10]  *Id*. at 317 n.22.

Soon after *Atkins* was decided, the Supreme Court of Ohio established the "substantive standards and procedural guidelines" for Eighth Amendment intellectual disability claims in Ohio in *State v. Lott*, 97 Ohio St. 3d 303 (Ohio 2002).  The court adhered to the clinical definitions cited with approval in *Atkins*, holding that to prevail on an *Atkins* claim, the defendant must prove that he or she:  (1) suffers from "significantly subaverage intellectual

---

[10] The AAIDD has cautioned, however, that "[t]he field of mental retardation is currently in a state of flux regarding not just a fuller understanding of the condition of mental retardation, but also the language and process used in naming, defining, and classifying" the condition.  AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* xiii (10th ed. 2002) (hereinafter, "AAMR-10").  At the heart of this evolving field is the very definition of intellectual disability, which has been revised nine times since 1908.  *Id*. at 20-23.

functioning," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18." *Id*. at 305. The court noted, however, that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue." *Id*. It therefore held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Id*.

In addition, the AAIDD and APA have updated their definitions of intellectual disability since *Atkins* was decided. In 2002, the AAIDD revised the adaptive-skills criteria to require a significant deficit in only one of three general categories: conceptual, social, and practical. AAMR-10 at 82.[11] The APA adopted this new construct of measuring adaptive behavior in its fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5"), published in 2013. *See* DSM-5 at 37. And in 2010, the AAIDD clarified that intellectual-functioning deficits are indicated by an IQ score "approximately two standard deviations below the mean" (a score of about 70) adjusted for "the standard error of measurement" (or "SEM"). AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Support* (11th ed. 2010) ("AAIDD-11") at 27.

Most recently, the Supreme Court has weighed in, expounding on the definition of intellectual disability in a string of three decisions and emphasizing in each that states must

---

[11] "Conceptual skills" include language, reading and writing, money concepts, and self-direction; "social skills" include interpersonal relationships, personal responsibility, self-esteem, gullibility and naivete, following rules, obeying laws, and avoiding victimization; and "practical skills" include daily activities such as eating, personal hygiene, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use, as well as occupational skills and maintaining a safe environment. AAMR-10 at 82.

adhere to the medical community's clinical standards in assessing intellectual disability for Eighth Amendment purposes. In its 2014 decision in *Hall v. Florida,* 572 U.S. 701 (2014), the Court struck down a Florida law that, as interpreted by the Florida Supreme Court, precluded the submission of additional evidence of intellectual disability where the prisoner's seven IQ scores in the record were all above 70 (ranging from 71-80) and two IQ scores that had been excluded from the record were under 70. *Id*. at 721. A strict cutoff for IQ scores, it explained, ran counter to "[t]he clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, [and] were a fundamental premise of *Atkins*." *Id*. at 720. "Intellectual disability is a condition," it declared, "not a number." *Id*. at 723. Courts, therefore, must consider the SEM, and "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id*. at 722-23.

The next year, the Supreme Court held in *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), that a state post-conviction court's determination that the habeas petitioner was not entitled to an evidentiary hearing on his *Atkins* claim was based on unreasonable determinations of the facts in violation of 28 U.S.C. § 2254(d)(2). *Id*. at 2283. It first found unreasonable the state court's finding that the petitioner's IQ score of 75 was inconsistent with subaverage intelligence when, accounting for the SEM, it was "squarely in the range of potential intellectual disability." *Id*. at 2277-78. The Court next found unreasonable the state court's refusal to grant the petitioner's request for an *Atkins* evidentiary hearing because the record failed to raise any question about the petitioner's adaptive-skills deficits when the petitioner presented evidence that he was born

prematurely at a very low birth weight and had a seizure as a child, was delayed

developmentally, and placed in special classes in school and in multiple mental health facilities;

and two experts opined that he was intellectually disabled. *Id*. at 2279-80.

Finally, two years later, in *Moore v. Texas*, 137 S. Ct. 1039 (2017), the Court overturned

a state habeas court's decision denying the petitioner's *Atkins* claim on the ground that, as it had

"instructed in *Hall*, adjudications of intellectual disability should be 'informed by the views of

medical experts.'" *Id*. at 1044 (quoting *Hall*, 134 S. Ct. at 2000). The state court, it held,

improperly concluded that the petitioner's IQ scores demonstrated that he was not intellectually

disabled when it failed to account for the SEM, which would have placed the scores at or below

70, requiring it to then continue its inquiry by considering other evidence of intellectual

disability. *Id*. at 1049-50. The state court also erred, the Court found, in its evaluation of the

petitioner's adaptive functioning. *Id*. at 1050.[12] The Court stressed that "States have some

flexibility, but not 'unfettered discretion,' in enforcing *Atkins*' holding." *Id*. at 1052-53 (quoting

*Hall*, 134 S. Ct. at 1998). The medical community's current standards, promulgated in the

DSM-5 and the AAIDD-11, it explained, act as a vital "constraint on States' leeway" by offering

"'the best available description of how mental disorders are expressed and can be recognized by

trained clinicians.'" *Id*. at 1053 (quoting DSM-5 at 7 and citing *Hall*, 134 S. Ct. at 1990, 1991,

---

[12] The Court found the state court incorrectly "overemphasized [the petitioner's] perceived adaptive strengths," despite the medical community's focus on "adaptive *deficits*"; relied on adaptive strengths developed "in [the] controlled setting" of prison, which is also discouraged by clinical guidelines; discounted traumatic childhood experiences, which the medical community considers "*risk factors*" for intellectual disability; and required the petitioner to show that any adaptive deficits were unrelated to "a personality disorder," when mental-health professionals recognize that many intellectually disabled people also have other mental or physical impairments. *Moore,* 137 S. Ct. at 1050-51 (emphasis in original).

1993-94, 1994-96) (employing current clinical standards), and *Atkins*, 536 U.S. at 308 n.3, 317 n.22 (relying on then-current standards)).

In light of this precedent, the Ohio Supreme Court recently overruled *Lott*'s holding that there is a rebuttable presumption that a defendant is not intellectually disabled if his or her IQ score is above 70. In *State v Ford,* the court replaced *Lott*'s test with the standard recognized by the Supreme Court in *Moore* as the "'generally accepted, uncontroversial intellectual-disability diagnostic definition.'" *State v Ford*, No. 2015-1309, 2019 WL 5792203, at *13 (Ohio Nov. 7, 2019) (quoting *Moore*, 137 S. Ct. at 1045). The court held:

> For purposes of eligibility for the death penalty, a court determining whether a defendant is intellectually disabled must consider three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement), (2) significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and practical), and (3) the onset of these deficits while the defendant was a minor. The trial court may consider expert testimony and appoint experts if necessary in deciding this issue.

*Id*. The court remanded the case to the trial court "to properly determine" whether the petitioner was intellectually disabled. *Id*.[13]

---

[13] Notably, Ohio's high court ordered the trial court to assess the defendant's current intellectual functioning. After a period of uncertainty, courts now consistently hold that, because intellectual disability is a developmental disorder that manifests before adulthood and remains unchanged throughout life, a defendant should be evaluated for intellectual ability for purposes of an *Atkins* claim at the time of the hearing, not at the time of the crime or trial. *See, e.g., Heller v. Doe*, 509 U.S. 312, 323 (1993) ("Mental retardation is a permanent, relatively stable condition . . . ."); *Moormann v. Schriro*, 672 F.3d 644, 649 (9th Cir. 2012) ("There is no clearly established federal law that a person who was not mentally retarded at the time of the crime or the trial may nevertheless be exempted from the death penalty pursuant to *Atkins*, because of subsequent mental deterioration. The law appears to be to the contrary and does not indicate retardation is a product of changing circumstances."); *Ochoa v. Workman*, 669 F.3d 1130, 1137-38 (10th

(continued...)

The Ohio Supreme Court also examined in *Ford* whether the trial court should have considered evidence regarding the "Flynn Effect," a "'generally recognized phenomenon' in which the average IQ scores produced by any given IQ test tend to rise over time, often by approximately three points per ten years from the date the IQ test is initially standardized.'" *Id.* at *11 (quoting *Black v. Carpenter*, 866 F.3d 734, 738 n.1 (6th Cir. 2017)). The court noted that the Supreme Court did not discuss the Flynn Effect in either *Hall* or *Moore*, but the AAIDD recommends that in "'cases in which a test with aging norms is used as part of a diagnosis of [intellectual disability], a corrected Full Scale IQ upward of 3 points per decade for age of the norms is warranted.'" *Id.* at *12 (quoting AAIDD, *User's Guide to Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports* 23 (11th ed. 2012)).

The court held, therefore, that the trial court should have discussed evidence regarding the Flynn Effect in evaluating the petitioner's IQ, "although it was in the trial court's discretion whether to include it as a factor in the IQ scores." *Id.*

### B. Procedural History of Wesson's *Atkins* and *Atkins*-Related Ineffective-Assistance Claim

Within two months of Wesson's indictment, his appointed counsel, Lawrence Whitney and Donald Hicks, requested the appointment of two experts, psychologist Jeffrey Smalldon, Ph.D., and mitigation specialist Thomas Hrdy. (Doc. 12-3 at 56-67.) The trial court granted the request. (*Id.* at 123.)

_____

[13](...continued)
Cir. 2012) (holding that Oklahoma's determination that intellectual disability is a static condition is neither contrary to, nor an unreasonable application of, *Atkins*).

Wesson did not assert a claim related to intellectual disability during the trial-court proceedings.  (*See* Doc. 12-8 at 26-34.)  During the mitigation phase of trial, however, Dr. Smalldon briefly touched upon Wesson's intellectual abilities.  (*See* Doc. 13-26 (Trial Tr.) at 71-164.)[14]  He testified that Wesson's full-scale IQ was 76, and he opined that, based on that score, Wesson had "borderline intellectual functioning," or the range between mild intellectual disability and low average.  (*Id*. at 93-94, 128, 132-33.)  Wesson functioned, Dr. Smalldon explained, at the third grade level in word recognition, sixth grade level in spelling, and second grade level in arithmetic.  (*Id*. at 115.)  He was unable to do anything but "pretty simple addition and subtraction and the simplest multiplication problems."  (*Id*.)

Dr. Smalldon was impressed by Wesson's apparent motivation to do well on the tests.  He said he had never "evaluated someone who was so focused and so intent at not being found mentally retarded, that was probably his overriding concern from the start."  (*Id*. at 93.)  He testified that Wesson tried hard to hide any intellectual weaknesses, "act[ing] as his own coach" to encourage himself and getting "very discouraged with himself" when he struggled.  (*Id*. at 94.)  He was, Dr. Smalldon recounted, "very eager to demonstrate his desire to be seen as intelligent and motivated to do his best."  (*Id*. at 95.)

Dr. Smalldon explained that Wesson did not do well in school, having completed only up to the seventh grade before dropping out.  (*Id*. at 107.)  He noted that Wesson also had a serious stuttering problem, which could have been caused by prenatal exposure to alcohol, as his mother was a "serious alcoholic."  (*Id*. at 107-08, 96.)  Fetal alcohol syndrome, he testified, is the "single greatest contributor to mental retardation."  (*Id*. at 97.)

---

[14] Dr. Smalldon did not submit a report to the trial court.

As to Wesson's functioning, Dr. Smalldon noted that a counselor had encouraged Wesson "to live independently in the community without a woman to depend on, . . . that he needed to stand on his own two feet and be able to function independently." (*Id*. at 122.) Wesson also had difficulty finding and maintaining employment, though this was also due to his criminal history. (*Id*. at 123-24.) And Wesson's relationships with women had "always been problematic," as he was "utterly unable to manage them in a healthy way or to maintain healthy boundaries . . . ." (*Id*. at 124.) He was extremely insecure and "seem[ed] to have become frantic whenever he perceived the possibilities of abandonment or rejection by a woman." (*Id*. at 125.)

On March 13, 2009, the panel imposed a sentence of death for the aggravated murder of Emil Varhola and additional sentences for the other noncapital offenses. (*See* Doc. 12-7 at 1-16.)

Wesson's first petition for post-conviction relief, filed on February 17, 2010, also did not contain any *Atkins*-related claims. (*See* Doc. 12-9 at 155-94.) Wesson did assert, however, that trial counsel were ineffective for failing "to ensure that a complete and cohesive psychological evaluation was conducted" of Wesson, particularly regarding anti-social personality disorder. (*Id*. at 174-75.) As support, he attached an affidavit of Dennis Eshbaugh, a clinical and forensic psychologist, who reviewed numerous documents and interviewed Wesson for about three hours. (Doc. 12-14 at 48-67.) Dr. Eshbaugh did not disagree with Dr. Smalldon's diagnosis of borderline intellectual functioning, but he made several observations relating to Wesson's intellectual abilities and functioning:

- Wesson told him that he lived independently as an adult "only briefly around 1977"; otherwise, he lived with girlfriends or relatives.

- Wesson's relationships with women were "volatile and extremely unstable."

- Around 1986 or 1987, Wesson thought he took and passed the GED examination, but later said no documentation could be found, and it was possible he took only the GED pre-exam.

- Wesson had "no long-term employment history or career direction." Wesson reported that he held a number of labor jobs, most of which were paid in unreported cash, in laundry work, painting, stocking and loading trucks, and general maintenance. At the time of the murder, he was unemployed.

- Wesson had an extensive criminal history with numerous incarcerations.

- Wesson reported that he spent his time on death row drawing and painting in oils, exercising, watching television, reading mystery novels, listening to music, and keeping a daily journal.

- Wesson had a "chronic history of maladjustment," including alcohol abuse, gang membership, crime, and domestic violence.

- The Ohio Department of Rehabilitation and Correction conducted several assessments of Wesson's academic abilities and intellectual functioning. His educational achievement level was tested to be at about the fifth grade level, and all but one of the estimates of his intellectual functioning were "significantly below average."

- Dr. Smalldon was a "very competent and experienced psychologist," but should have written a report, was "overly inclusive" in his findings, provided insufficient detail, should have highlighted Wesson's antisocial personality disorder rather than his possible, but undocumented, cognitive disorder associated with brain injury.

(*Id*.)

The trial court denied the petition. (*Id*. at 284-99.) The state appellate court affirmed that judgment, *State v. Wesson*, No. 25874, 2012 WL 4480109 (Ohio Ct. App. Sept. 28, 2012), and the Ohio Supreme Court declined jurisdiction, *State v. Wesson*, 140 Ohio St. 3d 1438 (Ohio 2014).

Wesson first raised an *Atkins*-related claim in an application to reopen his direct appeal, filed on March 21, 2014, in the Ohio Supreme Court. (Doc. 41-3.) He asserted that his appellate counsel was ineffective for failing to raise a claim that his trial counsel was ineffective for failing to present through expert testimony a complete diagnosis of intellectual disability. (*Id*. at 42-43.) The court summarily denied the application. *State v. Wesson*, 140 Ohio St. 3d 1449 (Ohio 2014).

On September 24, 2015, Wesson filed a petition for writ of habeas corpus in this Court. (Doc. 16.) He asserted six grounds for relief, including an *Atkins* claim and related claim of ineffective assistance of trial counsel. (Doc. 16 at 47-104.) Soon after, he moved to stay his case in this Court and hold it in abeyance until he had exhausted certain of his ineffective-assistance claims and his *Atkins* claim. (Doc. 20.) Respondent opposed the motion. (Doc. 22.) On November 20, 2015, this Court granted Wesson's motion to stay the case and hold it in abeyance. (Doc. 25.)

On December 11, 2015, Wesson filed a second-in-time post-conviction petition in the state trial court, raising, among other claims, his *Atkins* claim and related ineffective- assistance claim. (Doc. 41-1 at 13-85.) He supported the claims with reports from psychologists Daniel Grant and Stephen Greenspan, both of whom opined that Wesson is intellectually disabled under current medical standards (*id*. at 88-120); an affidavit of Dr. Smalldon, the psychologist who testified at Wesson's mitigation hearing, in which he attested that he did not have the requisite expertise or sufficient information about Wesson to offer an opinion on whether Wesson was intellectually disabled (*id*. at 121-24); school records (*id*. at 125-41); medical records (Doc. 41-2 at 87-172); affidavits of Wesson's family members (*id*. at 173-89); and affidavits of Wesson's initial post-conviction counsel, who explained their inexperience in capital cases in general and

specifically with intellectual disability and their reliance on Dr. Eshbaugh, who was not an expert on intellectual disability (Doc. 41-3 at 5-9).

The state court denied the petition on the grounds that it was successive and untimely under Ohio's statutory post-conviction relief scheme. (Doc. 41-3 at 106-17.) The state appellate court affirmed that judgment. *State v. Wesson*, No. 28412, 2018 WL 1189383 (Ohio Ct. App. March 7, 2018). And the Ohio Supreme Court denied further post-conviction review. *State v. Wesson*, 153 Ohio St. 3d 1433 (2018), *cert. denied*, 139 S. Ct. (2018).

Wesson then returned to this Court and filed an amended habeas petition on January 9, 2019. (Doc. 36.) In it, he reasserts his original six grounds for relief, including the now-exhausted *Atkins* claim (*id*. at 115-23) and related claim of ineffective assistance of trial counsel (*id*. at 110-14).

### C.   Wesson's *Atkins* Claim

Wesson asserts that the evidence he presented to Ohio state courts on post-conviction review establishes that he is intellectually disabled under Ohio law, and the Eighth Amendment, therefore, prohibits his execution under *Atkins*. (Doc. 36 at 115-24; Doc. 46 at 138-45.) If this Court were to consider the merits of this claim, it would be through *de novo* review, as no state court has adjudicated these claims on the merits. *See* 28 U.S.C. § 2254(d) (AEDPA's deferential standard applies only to "claim[s] that [were] adjudicated on the merits in State court proceedings"). And Ohio law, now set forth in *Ford*, would apply. *See Black v. Carpenter*, 866 F.3d 734, 737, 740 (6th Cir. 2017) (holding that district court properly applied most current Tennessee law regarding the definition of intellectual disability in its *de novo* review of petitioner's *Atkins* claim, as the *Atkins* Court "'le[ft] to the States the task of developing

appropriate ways to enforce' its prohibition on executing mentally retarded criminals") (quoting *Atkins*, 536 U.S. at 317).

Wesson relies on Dr. Grant and Dr. Greenspan's reports, each written in the fall of 2015 and submitted with his second state post-conviction petition. (Doc. 41-1 at 88-103 (Grant Rpt.); Doc. 41-1 at 104-68 (Greenspan Rpt).) Dr. Greenspan is a nationally recognized expert in intellectual disability and forensic evaluation of that condition as well as fetal alcohol spectrum disorders. (*Id*. at 106-07.) He claims to be the most cited authority in the AAIDD and APA's diagnostic manuals and wrote four chapters in the 2015 AAIDD guidebook *The Death Penalty and Intellectual Disability*. (*Id*. at 106.) Dr. Grant specializes in neuropsychology, forensic psychology, and educational psychology. (*See id*. at 100-01.) Both experts reviewed the materials submitted with Wesson's state post-conviction petitions and interviewed Wesson in prison. (*See id*. at 88, 107.) Dr. Grant tested Wesson on intelligence; academic, language, memory, visual spatial, and motor and tactile skills; executive functions; and adaptive behavior. (*See id*. at 90-97.) Both Dr. Grant and Dr. Greenspan diagnosed Wesson as satisfying the three criteria of intellectual disability under the prevailing clinical standards at the time of their evaluations, which were recognized and adopted by the Ohio Supreme Court in *Ford*: intellectual functioning, adaptive behavior, and early developmental onset. (*Id*. at 99, 114.)

*Intellectual functioning*. Under the first prong of *Ford*'s definition of intellectual disability, Wesson must demonstrate "intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement . . . ." *Ford*, 2019 WL 5792203, at *13. Wesson's intelligence and educational achievement scores include:

- In 1998, Wesson was given the Revised Beta-II group-administered nonverbal IQ test. He received an IQ score of 87, which Dr. Grant corrected for the Flynn Effect to be 80. (Doc. 41-1 at 92.)

- Wesson was administered the General Ability Measure for Adults (GAMA) IQ test three times while incarcerated, achieving scores of 59 (undated), 79 (in 2001), and 90 (in 2003). (*Id*.) Dr. Grants explains, however, that this test is not considered reliable in diagnosing intellectual disability, as it is group-administered and has been found to have an unreasonable error rate. (*Id*.)

- In 2008, Dr. Smalldon administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-3). Wesson scored a verbal IQ of 74; performance IQ of 81; and a full-scale IQ of 76. Dr. Grant and Dr. Greenspan applied the Flynn Effect to find a corrected full-scale IQ of 72. (*Id*. at 91, 111.)

- In 2008, Dr. Smalldon also administered the Wide Range Achievement Test Revision-3 (WRAT-3). This yielded reading recognition at grade level 4.7, with a standard score of 66; spelling at grade level 6.2, with a standard score of 76; and arithmetic at grade level 2.9, with a standard score of 56. (*Id*.)

- In 2015, Dr. Grant administered the WAIS-4. Wesson obtained a full-scale IQ score of 76. Dr. Grant and Dr. Greenspan applied the Flynn Effect to find a corrected full-scale IQ score of 73. (*Id*.)

- In 2015, Dr. Grant also gave Wesson the Reynolds Intellectual Assessment System (RIAS) Verbal Intelligence Scale. He scored a verbal intelligence index (IQ) of 76. Dr. Grant applied the Flynn Effect to find a corrected score of 72. (*Id*. at 92.)

- In 2015, Dr. Grant also administered the WRAT-4. This yielded a word reading skills at grade level at 4.4, with a standard score of 71; reading comprehension of sentences at grade level 7.7, with a standard score of 81; spelling skills at grade level 5.5 with a standard score of 76; and math computation skills at grade level of 3.5, with a standard score of 73. (*Id*. at 94, 111.)

Both Dr. Grant and Dr. Greenspan concluded that, based on these test scores, Wesson met the first criteria for intellectual disability. (*See id*. at 99, 110-11.) Wesson's three IQ scores of 76 (WAIS-3, WAIS-4, and RIAS) in 2008 and 2015, when corrected for the Flynn Effect to 72, 72, and 73, respectively, are within one standard error of measurement of an IQ of 70. (*Id*. at

99, 110.)  Moreover, the scores are all within one point of each other, which, as Dr. Grant

observes, "indicates consistency of Mr. Wesson's performance over time and across two separate

evaluations[,] which strengthens the accuracy of these measures and the accuracy of the

prediction of his level of intelligence."  (*Id*. at 92.)

Further, Wesson's performance on the educational achievement tests was consistent with

his IQ scores.  Dr. Greenspan explained that, although "educational achievement is not identical

with intelligence, the two concepts are closely related and academic scores that low (in a man

then just over age 50) are indicative of very significant cognitive deficits."  (*Id*. at 111.)  He

concluded, "a number of intellectual and other cognitive tests have been administered to Mr.

Wesson, and these indicate intellectual deficits that are congruent with someone who falls in the

upper range of the Intellectual Disability spectrum."  (*Id*.)

*Adaptive behavior*.  The second element of *Ford*'s definition of intellectual disability is

"significant adaptive deficits in any of the three adaptive-skill sets (conceptual, social, and

practical) . . . ."  *Ford*, 2019 WL 5792203, at *13.  Dr. Grant and Dr. Greenspan found Wesson

satisfied this criteria as well.  (*See* Doc. 41-1 at 96, 111-12.)

Dr. Grant administered the Texas Functional Living Scale to assess Wesson's adaptive

behavior.  (*Id*. at 96.)  Dr. Greenspan explained that this is a "newly developed 'direct'

(individually administered like an IQ test)" test.  (*Id*. at 111.)  It is divided into four areas:

ability to use analog clocks and calendars; ability to perform calculations involving time and

money; ability to utilize basic communications skills; and everyday activities and memory.  (*Id*.

at 96.)  Dr. Grant reported that Wesson obtained a standard score of 67, "indicating significant

limitations in his adaptive behavior skills."  (*Id*.)  His lowest score was on the communication

subtest, which was consistent with his performance on the various language tests Dr. Grant had administered. (*Id.*) Grant concluded that Wesson exhibited deficits within the conceptual domain of adaptive functioning, as he performed poorly on the academic tests, tests measuring communication and language skills, and memory and retention of information over time. (*Id.*)

Dr. Greenspan agreed that Wesson's score on the adaptive behavior test showed "very substantial adaptive impairment." (*Id.* at 111.) He further provided a detailed summary of the "substantial amount of documentary and descriptive information" demonstrating that Wesson has 'significant impairments" in two domains of adaptive functioning – practical and conceptual – and "probably" also the third, social (although only one is required to satisfy the current guidelines). (*Id.*) He reported:

> ln terms of Practical adaptive behavior, Mr. Wesson has never lived independently (as reflected in a counselor pointing out that he has always depended on women – family members or girlfriends – to help him cope with the demands of daily living. He has also never been able to hold a long-term job. He was not able to obtain a Driver's License, something universally sought by adolescents and adults.[15]

> Conceptual adaptive behavior is obviously a big area of deficit for Mr. Wesson, as reflected in the fact that he has very low academic achievement scores, reportedly struggled in school and dropped out at age 16 without eve[n] completing the 7th grade. He tried, but was unable to obtain a GED. Educational records are very sparse (a challenge, reflecting the passage of many years, is that records are sparse and lack detail), but he struggled considerably. Mr. Wesson was held back several grades, a practice (today frowned upon) which in the absence of special education services at that time, is a strong indicator of cognitive impairment.

---

[15] Dr. Greenspan subsequently acknowledged in a supplemental declaration that he had been informed by a former attorney of Wesson's that Wesson had in fact obtained a driver's license in the 1990s, when he was in his thirties. (Doc. 41-3 at 11.) But Wesson managed to hold on to it for only a short time before it was suspended as a result of a DUI conviction, and he never sought to have the license reinstated. (*Id.*) Dr. Greenspan declared that this fact was "of extremely minimal importance" and "in no way cause[d] [him] to change [his] opinion about [Wesson] having ID." (*Id.*)

Mr. Wesson's three paternal cousin[s] – Randall (about the same age), Herman [(]seven years older), and Stephen (less than a year older) – all knew Hersie well and have testified in affidavits about his considerable adaptive limitations. Two have led distinguished lives (Stephen as a college administrator and Herman as a former Speaker of the California State Assembly and a current member of the Los Angeles City Council) and thus have the competence and credibility to speak authoritatively about their cousin.

The cousins all indicated in their 2015 affidavits, that Hersie was considered "slow" and could not do many of the things peers of the same age could do. For example, their grandmother (the family matriarch) would entrust the other children to go to the store with money and a list, but not Hersie, as he could not be trusted to get what was on the list or to make sure that he received the correct change (one cousin testified that he never saw his cousin count money). Hersie could not participate in games that involved any complex rules, and he had no same-age friends (this is almost a universal characteristic of individuals with ID). He had no long-term employment history and never was able to live independently. He was constantly teased and easily manipulated by others. He showed very poor social judgment (a hallmark of ID as well as FASD [fetal alcohol spectrum disorder]), as when he threw rocks for no reason at some other neighborhood youths, causing him and his cousin to have to flee. He grew up in a household without encouragement or parental love, support, or protection. He lacked a stable living situation, as his parents were both incompetent alcoholics, and he and his siblings often ended up staying with their grandmother.

My interview with Mr. Wesson [on] Ohio's death row, provided additional support for a diagnosis of ID, particularly in regard to social reasoning. In a structured interview tapping Mr. Wesson's degree of "common sense," Mr. Wesson showed substantial lack of ability to anticipate social risk. Such a deficit is very indicative of ID and also of FASD.

In sum, Mr. Wesson has deficits in adaptive functioning that are congruent with ID. It is my professional opinion, therefore, that prong two is satisfied.

(*Id*. at 112.)

*Early developmental onset*. To satisfy the third prong of *Ford*'s definition of intellectual disability, Wesson must show that the onset of these deficits occurred while he was a minor. *Ford*, 2019 WL 5792203, at *13. Dr. Grant and Dr. Greenspan both concluded that the record supported this requirement as well.

106

Dr. Grant focused on Wesson's academic record to prove early onset. He noted that Wesson "was always a poor student . . . ." (Doc. 41-1 at 99 (Grant Rpt.).) He reported that Wesson was in the fifth grade in 1969 and socially promoted to the seventh grade in 1970 to place him with his own age group. (*Id*. at 89.) For a period of time in 1971 and 1972, Wesson was in a class that was ungraded. (*Id*.) From 1969 to 1972, he was either below grade level or earned a D or F in his classes, except for art class, in which he received a C. (*Id.*) Wesson withdrew from school while he was in the eighth grade. (*Id*.) In addition, when Wesson was sixteen years old, he was administered a reading test that yielded a vocabulary grade level of 3.3 and a reading comprehension grade level of 2.6. (*Id*.) Dr. Grant stated that those scores are seven to eight grade levels behind where he should have been at that age. (*Id*.) He also noted that Wesson would have qualified for special education classes, but they were not offered at his schools while he attended them. (*Id*.)

Dr. Greenspan based his opinion regarding developmental onset on his finding that Wesson "very likely" has fetal alcohol spectrum disorder. (*Id*. at 113 (Greenspan Rpt.).) He reported that Wesson's mother was a "confirmed alcoholic who drank alcohol regularly throughout her pregnancy with him." (*Id*. at 105.) He noted that Wesson is small in stature and has a very small head, both of which are typical of individuals with the disorder. (*Id*.) Fetal alcohol spectrum disorder also causes other functional consequences present in Wesson, he opined, including delays in developmental milestones, deficient general intelligence and poor school functioning, a mixed neuropsychological pattern, problems in adaptive behavior, and very poor social judgment and failure to learn from experience. (*Id*.)

Dr. Greenspan identified other "significant early risk indicators for ID" in Wesson's history, including meningitis at birth, small head size, and a severe head injury at eleven months old, along with several other reported head injuries. (*Id.*) He also noted the "extreme environmental abuse and neglect" that Wesson endured as a child as a contributing factor. (*Id.*) Wesson's father physically and verbally abused him on a daily basis, often because Wesson stuttered or because he was given a blood transfusion when he had meningitis. (*Id.* at 105; *see also* Doc. 13-26 (Trial Tr.) at 31-34 (Yvette Wesson Test.).) Wesson's mother severely neglected him. For example, she put gin in his bottle when he was a baby and left him locked in a closet with his young sister while she went out. (Doc. 41-1 at 105 (Greenspan Rpt.); *see also* Doc. 13-26 (Trial Tr.) at 28-30 (Yvette Wesson Test.).)

Respondent's entire challenge to the merits of Wesson's *Atkins* claim comprises three paragraphs of his return of writ. (*Id.* at at 68-69.) He first asserts that "[t]he record here demonstrates that Wesson cannot meet this burden" under *Lott* of demonstrating that he is intellectually disabled because neither Dr. Grant nor Dr. Greenspan articulated "an opinion to a reasonable degree of medical certainty that Wesson meets Ohio's definition of intellectual disability for purposes of the Eighth Amendment." (*Id.* at 68.) Dr. Greenspan concluded in his report, however, "It is my opinion, to a reasonable degree of professional certainty, that the evidence I gathered and reviewed is congruent with . . . a diagnosis" of intellectual disability. (Doc. 41-1 at 114 (Greenspan Rpt.).) And Dr. Grant did not frame his conclusion as an "opinion to a reasonable degree of medical certainty," but he clearly and unambiguously "diagnosed" Wesson in his report with "Intellectual Disability, Within Mild Range." (*Id.* at 99 (Grant Rpt.).)

Indeed, both experts applied the current clinical standards, which have been recognized and adopted by both the United States and Ohio supreme courts.

Respondent also argues that this Court may not consider the information set forth in the expert reports under AEDPA's § 2254(e)(2), which precludes an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings" unless the applicant satisfies certain conditions. 28 U.S.C. § 2254(e)(2). (Doc. 43 at 68-69.) But that provision does not apply here, as Wesson submitted this evidence to state courts in state post-conviction proceedings and it is now in the state-court record. *See Holland v. Jackson,* 542 U.S. 649, 653 (2004) (per curiam) (holding that § 2254(e)(2) applies "when a prisoner seeks relief based on *new evidence*") (emphasis added)).

Notably, Respondent has not presented an expert to counter the conclusions of Wesson's experts. Nor does he refute any specific factual findings supporting Wesson's *Atkins* claim. Respondent points only to Dr. Smalldon's testimony during the mitigation phase of Wesson's trial that Wesson was not intellectually disabled. (*See, e.g.*, Doc. 49 (Mem. in Opp.) at 7.

The Court finds that, based on this record, Wesson has a credible claim that he is intellectually disabled and therefore exempt from execution.

### D. Procedural Default of Wesson's *Atkins* and *Atkins*-Related Ineffective-Assistance Claims

Respondent's stronger argument, however, is that Wesson's *Atkins* claims are procedurally defaulted because Wesson first raised them in a second-in-time post-conviction petition that the state courts denied as untimely and successive. (Doc. 43 at 64, 66-69.) Wesson, for his part, concedes that the claims are procedurally defaulted, but he argues that the default should be excused. (*See. e.g.,* Doc. 46 at 13, 119-22.) As explained above, a petitioner may

overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Wesson asserts that his *Atkins* claims' default should be excused either for cause – namely, his trial and post-conviction counsel's failure to raise the claim – or because there will be a "fundamental miscarriage of justice" if the claim is not considered. (Doc. 46 at 119-22.)

### 1. Cause and Prejudice: Ineffective Assistance of Trial and Post-Conviction Counsel

Wesson contends the default of his *Atkins* claim was caused by the ineffective performance of his trial counsel in failing to investigate and raise in the trial court a claim that his intellectual disability precluded imposition of the death penalty, and in failing to consult with, and present the testimony of, a qualified intellectual-disability expert. (Doc. 46 at 132-37.) "Attorney error that constitutes ineffective assistance of counsel is cause." *Coleman v. Thompson*, 501 U.S. 722, 754 (1991). However, an ineffective-assistance claim cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). And Respondent asserts that Wesson's *Atkins*-related ineffective-assistance claim, like the other claims Wesson raised in his second post-conviction petition, as previously analyzed, is procedurally defaulted. (Doc. 43 at 64-65.)

Wesson seeks to overcome this impediment by arguing, as he did with his other defaulted ineffective-assistance claims, that the default of his *Atkins*-related ineffective-assistance claim

should be excused for cause under the test established in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  (*See* Doc. 49 (Reply Mem.) at 3-4.)

As explained above, the third and fourth requirements of the *Martinez / Trevino* test are satisfied here:  post-conviction review provided Wesson with the first opportunity for review of this ineffective-assistance claim as it relies on extra-record evidence, and the Sixth Circuit has held that *Trevino* and its modification of *Martinez* applies in Ohio in such cases.  *White v. Warden, Ross Corr. Inst.*, 940 F.3d 270, 277 (6th Cir. 2019).

Wesson argues that this ineffective-assistance claim meets the first two requirements of the *Martinez / Trevino* test as well.  He contends he meets the first element of the test because it is a "substantial" claim with "some merit."  *Martinez*, 566 U.S. at 14.  As previously explained, under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), to prevail on an ineffective-assistance claim, a petitioner must demonstrate both that counsel performed deficiently and that he or she was prejudiced by counsel's errors.  The Supreme Court was clear in *Strickland* that defense counsel has a duty to reasonably investigate the facts of the case or reasonably determine that an investigation is not necessary, and the failure to do so is deficient performance.  *Id.* at 690-91; *see also Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (petitioner had an "excruciating life history," yet counsel focused exclusively on his direct responsibility for murder).  Indeed, the Sixth Circuit repeatedly has found constitutionally ineffective assistance where counsel failed to conduct an adequate investigation, including interviewing potentially important witnesses or experts and presenting important testimony or evidence at trial.  *See, e.g., Frazier v. Huffman*, 343 F.3d 780, 795-99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's

brain injury); *Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir. 2000) (finding deficient performance where counsel failed to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Groseclose v. Bell,* 130 F.3d 1161, 1170 (6th Cir. 1997) (finding ineffective assistance where counsel had no strategy and conducted no investigation at all).

Both parties point to *Frazier v. Jenkins*, 770 F.3d 485 (6th Cir. 2014), for support on this issue. The facts in *Frazier* are quite similar to this case. In *Frazier*, the petitioner, James Frazier, argued that his trial counsel performed deficiently in withdrawing his *Atkins* claim before his 2005 trial and in failing to retain an intellectual-disability expert. *Id.* at 500-02. Frazier's IQ score of 72 was slightly above 70 but within the standard error of measurement. *Id.* at 500. The Social Security Administration also had determined that Frazier was intellectually disabled. *Id.* And, interestingly, Frazier's expert was also Dr. Smalldon. *Id.* Frazier's counsel claimed they withdrew the *Atkins* motion because of Frazier's IQ score, and on the advice of Dr. Smalldon and a second expert, they did not believe that the *Lott* presumption could be overcome. *Id.*

There is a critical distinction, however, between the two cases: the Ohio Supreme Court adjudicated, and rejected, Frazier's *Atkins*-related ineffective-assistance claim on the merits. *Frazier*, 770 F.3d at 500 ("The Ohio Supreme Court adjudicated this claim on the merits, and thus, we afford that decision substantial deference under AEDPA."). The state court held that counsel's representation was not constitutionally defective because: (1) Dr. Smalldon testified that Frazier's full-scale IQ score of 72 was "pretty accurate"; (2) Frazier failed to present

evidence that linked his Social Security benefits to his mental retardation claim; (3) there was no evidence that Frazier's attorney failed to consult with him prior to withdrawing the motion, particularly given Frazier's in-court statements before the motion was withdrawn; and (4) counsel was permitted to rely on the judgments of Dr. Smalldon and the other expert. *Id*. (citing *Frazier*, 115 Ohio St. 3d at 163).

The circuit court found that, given the record in the case, counsel's performance was "troubling" and "questionable" for two reasons. *Id*. at 500, 501. First, the court noted that Ohio courts have found defendants intellectually disabled even with IQ scores above 70. *Id*. at 500 (citing *State v. Gumm*, 169 Ohio App. 3d 650 (2006)). And, it observed, there was "plenty of evidence" to suggest that there was a "non-frivolous chance" that if counsel had not withdrawn the *Atkins* motion, the state trial court would have concluded that Frazier had met the standard for intellectual disability, including a "well-documented history of academic struggles" and IQ scores within the standard error of measurement. *Id*. at 500-01. Second "and more fundamentally," the court stated,

> we fail to see the downside in having a non-frivolous *Atkins* hearing, and it is difficult to ascertain a strategic reason for withdrawing the motion in this case. These hearings are before the judge, not the jury, . . . and thus, no potentially prejudicial material would be kept from the jury by foregoing the hearing. Moreover, to the extent that the evidence is helpful to Frazier, nothing bars counsel from presenting the same information to the jury during the mitigation stage of trial (as happened during Frazier's trial). By choosing to withdraw the motion for an *Atkins* hearing, counsel deprived Frazier of the best opportunity to create a full record on the issue and to allow the state-trial-court judge—the judicial officer with the best sense of Frazier's actual abilities—to decide whether he met the *Lott* definition of mental retardation.

*Id*. at 501 (internal citations omitted).

Ultimately, however, the Sixth Circuit held that under AEDPA's deferential standard of § 2254(d)(1), it could not conclude that the state court's "ultimate decision" was objectively unreasonable. *Id*. As Respondent points out, the circuit court agreed with the state court that "[l]awyers are permitted to rely upon qualified experts," and "[f]airminded jurists could find that counsel's reliance upon Dr. Smalldon's opinion was consistent with professional norms." *Id*. at 501 (citing *Murphy v. Ohio*, 551 F.3d 485, 500–01 (6th Cir. 2009)). It explained that Dr. Smalldon had significant experience in consulting in capital cases, many of which involved intellectual disability, and "Frazier ha[d] not shown that Dr. Smalldon [was] unqualified." *Id*. Moreover, it reasoned, Dr. Smalldon had met Frazier and the new post-conviction expert relied only on Dr. Smalldon's report and other materials available at trial. *Id*. Therefore, the court concluded, Frazier did not show that Dr. Smalldon's opinion was unreasonable or that he was unqualified, and counsel, in turn, was reasonable to rely on him. *Id*.

Wesson argues that his trial counsel's failure to raise an *Atkins* claim was, as in *Frazier*, "troubling." (*See* Doc. 46 at 132-37.) Counsel were aware, he asserts, of Wesson's IQ scores, which like Frazier's were close to 70, and history of poor functioning, and they should have further investigated his intellectual abilities and obtained a qualified intellectual-disability expert, such as Drs. Grant or Greenspan. (*Id*. at 134-35.) Instead, counsel "apparently" relied on Dr. Smalldon's opinion that Wesson was not intellectually disabled and chose not to pursue the claim. (*Id*. at 135-36.)

Unlike *Frazier*, however, Wesson argues that he can demonstrate that Dr. Smalldon was unqualified and unprepared to render his opinion at trial that he was not intellectually disabled. (*Id*. at 134-35.) Wesson submitted Dr. Smalldon's affidavit with his state post-conviction

114

petition, in which Dr. Smalldon averred that he should not "have offered that opinion." (Doc. 41-1 at 122 (Smalldon Aff.).) Dr. Smalldon stated that intellectual disability is "not [his] specialty area of expertise," and he was not familiar enough with the Flynn Effect or the "complexities and nuances involved in trying to assess adaptive capacities . . . ." (*Id*. at 123.) Dr. Smalldon acknowledged that he should have examined the issue more carefully and recommended that counsel hire an intellectual-disability expert. (*Id*.) He further conceded that he did not coordinate with the mitigation specialist effectively to obtain sufficient information for his assessment, and "[f]or that reason alone, [he] should have stopped short of offering the Court an opinion on the mental retardation issue." (*Id*. at 122-23.) And, finally, contrary to *Frazier*, Wesson's proposed experts, Drs. Grant and Greenspan, both interviewed Wesson and obtained more current and thorough data from which to assess him. (*Id*. at 88 (Grant Rpt.), 107 (Greenspan Rpt.).)

Accordingly, Wesson argues that based on the record and *Frazier*, his *Atkins*-related ineffective-assistance claim is "substantial" and meets the first requirement of the *Martinez / Trevino* test.

Wesson also claims that his *Atkins*-related ineffective-assistance claim meets the second requirement of the *Martinez / Trevino* test, in that his initial post-conviction counsel were deficient in their failure to raise this *Atkins*-related trial counsel ineffective-assistance claim. Wesson submitted affidavits from his initial post-conviction counsel, Jennifer Prillo and Benjamin Zober of the Ohio Public Defender's Office, in support of his second post-conviction petition. (Doc. 41-3 at 5-7 (Prillo Aff.); 8-9 (Zober Aff.).)

Prillo stated in her affidavit that Wesson's case was her first post-conviction case as lead counsel, and her co-counsel, Zober, was a "novice" death penalty defense attorney with no significant post-conviction experience. (*Id*. at 6.) She averred that they "struggled some with this case" because of their joint inexperience. (*Id*.) She also stated that their difficulties were compounded by the high caseload of the Office's Death Penalty Division and its "very tight" budget. (*Id*.) As to Wesson's intellectual abilities, Prillo stated that she "had some concerns," but "lacked any prior experience litigating intellectual disability claims." (*Id*. at 7.) She decided Wesson did not have an intellectual disability claim after consulting with Dr. Eshbaugh, although he was not an expert in that field and they did not consult such an expert. (*Id*.) She averred that she had no strategic or tactical reason to omit an *Atkins* claim and did not consider conducting a more in-depth investigation into that issue. (*Id*.) Zober concurred with Prillo's account. He stated that they "struggled" with Wesson's case and their investigator was "mysteriously absent." (*Id*. at 9.) He also agreed with co-counsel Prillo that there was no legal strategy or tactics behind any omission of claims. (*Id.*)

The Court finds that Wesson has presented a legitimate argument under *Martinez* and *Trevino* that the ineffective assistance of his initial post-conviction counsel may constitute cause to overcome the procedural default of his *Atkins*-related claim of ineffective assistance of trial counsel, which in turn may constitute cause for the procedural default of his *Atkins* claim, which itself appears credible.

## 2.     Actual Innocence:  Intellectual Disability

Wesson also claims that the procedural default of his *Atkins* claim should be excused because he is "actually innocent" of the death penalty. (Doc. 46 at 139-41.) As noted above,

capital defendants can overcome the procedural default of constitutional claims by showing that a failure to address the claims, despite the procedural bars, would result in a "miscarriage of justice," meaning that the defendant is actually innocent of the death penalty itself. *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). In this context, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. A petitioner is not required to show a "conclusive exoneration." *House v. Bell*, 547 U.S. 518, 553 (2006). But the actual-innocence gateway for procedurally defaulted claims is restricted to "extraordinary" cases. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

In *Frazier v. Jenkins*, the Sixth Circuit recognized that an actual-innocence argument premised on an *Atkins* claim "cuts through all of the potential procedural bars and is properly before" a habeas court. *Frazier*, 770 F.3d at 497 (citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)); *but see id.* at 506-07 (Sutton, J., dissenting) (stating that a petitioner's gateway claim that he was actually innocent of the death sentence given his intellectual disability must have an "independent constitutional claim" attached to it; otherwise, the concept of procedural default would never apply to *Atkins* claims). To meet this standard, therefore, Wesson must show by clear and convincing evidence that he satisfies Ohio's definition of intellectually disabled, which "'is not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence.'" *Id*. at 497 (quoting *Elec. Workers Pension Trust Fund of Local Union # 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003)).

As previously stated, Wesson has presented a plausible claim of intellectual disability under *Atkins*.

**E.     Evidentiary Hearings in Federal Habeas Cases**

Wesson seeks an evidentiary hearing to present evidence supporting his argument that the procedural default should be excused, whether for cause due to the ineffective assistance of his trial and post-conviction counsel, or that he is actually innocent of the death penalty.  (Doc. 47 (Mtn. for Evid. Hrg.) at 4-5.)  Respondent opposes that request.  (Doc. 48 (Brf. in Opp.).)

AEDPA restricts district courts' authority to conduct evidentiary hearings in habeas corpus cases.  Section 2254(e)(2) of the Act precludes an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings" unless the applicant satisfies certain conditions.  28 U.S.C. § 2254(e)(2).  Those conditions are:

> (A)    the claim relies on –
>
>> (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Under AEDPA, therefore, district courts may conduct a hearing to introduce new evidence in support of a claim "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met."  *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004).[16]

---

[16] The Supreme Court announced a further limitation on evidentiary hearings in habeas cases in *Cullen v. Pinholster*, 563 U.S. 170 (2011), holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the

(continued...)

Wesson argues that § 2254(e)(2) does not apply here because he does not seek a hearing on his *Atkins* "claims," but only on whether those claims are procedurally defaulted. (Doc. 47 at 4-5.) As he points out, federal habeas courts may consider new evidence when deciding whether there is cause and prejudice or actual innocence to excuse a procedurally defaulted claim. *See, e.g., Cullen v. Pinholster*, 563 U.S. 170, 214-16 (2011) (Sotomayor, J., dissenting) (recognizing that a federal habeas petitioner "might be able to obtain federal-court review of his new evidence if he can show cause and prejudice for his failure to present the 'new' claim to a state court"); *House*, 547 U.S. at 537-38 ("when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence'") (quoting *Schlup v. Delo*, 513 U.S. 298, 331-32 (1995); *Cunningham*, 756 F.3d at 486 n.4 (evidence developed at evidentiary hearing on whether claim was exhausted or procedurally defaulted may be considered on federal habeas review); *Rideau v. Russell*, 342 Fed. Appx. 998, 1003 (6th Cir. 2009) (remanding habeas case to district court to conduct cause-and-prejudice hearing); *Howard v. Bouchard*, 405 F.3d 459, 478-79 (6th Cir. 2005) (hearing held "for the express purpose" of analyzing ineffective assistance of counsel as cause and prejudice); *Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993) (noting that a

---

[16](...continued)
claim on the merits." *Id.* at 181. *Pinholster*'s restrictions do not apply here, however, as Wesson's *Atkins*-related claims were not adjudicated on the merits by state courts. *Id.*; *see also Cunningham v. Hudson*, 756 F.3d 477, 487 n.4 (6th Cir. 2014).

hearing on the issue of cause and prejudice would have been appropriate to determine whether a sufficient showing of ineffective assistance of counsel has been made).

Thus, where "there are factual issues in dispute and an insufficient record upon which to resolve the legitimate claims [of ineffective assistance of counsel] advanced by the petitioner," an evidentiary hearing on the issue of cause and prejudice may be warranted. *Alcorn v. Smith*, 781 F.2d 58, 60 (6th Cir. 1986) (finding the district court erred in denying habeas petitioner's request for a cause-and-prejudice hearing). Conversely, "when a court is able to resolve a habeas claim on the record before it," and the petitioner "has not identified any evidence that he would introduce other than exhibits already made part of the state or federal habeas record," an evidentiary hearing may not be necessary. *Black v. Carpenter*, 866 F.3d 734, 742 (6th Cir. 2017) (citing *Sawyer v. Hofbauer*, 299 F.3d 605, 612 (6th Cir. 2002)) (finding district court acted within its discretion in denying petitioner's request for an evidentiary hearing on *Atkins* claim where he failed to demonstrate that a "hearing was required in order for the district court properly to evaluate the voluminous record before it" under the state standard for intellectual disability).

Here, there is an insufficient record upon which to resolve Wesson's procedural-default claims. For instance, Wesson has not presented evidence regarding his trial counsel's investigation into his intellectual abilities or their advice and communications with Wesson on that issue. An evidentiary hearing would give Wesson the opportunity to demonstrate why his counsel did not raise and preserve on the record a claim that Wesson was intellectually disabled. As the Sixth Circuit remarked in *Frazier*, "we fail to see the downside in having a non-frivolous *Atkins* hearing, and it is difficult to ascertain a strategic reason for withdrawing the motion in this

case." *Frazier*, 770 F.3d at 501. In the alternative, an evidentiary hearing also would assist the Court in determining whether the evidence Wesson presents concerning his intellectual abilities meets the gateway actual-innocence clear-and-convincing standard.

Accordingly, the Court will permit the parties to address the following issues at an evidentiary hearing: (1) whether Wesson's initial state post-conviction counsel rendered ineffective assistance by failing to raise a claim of ineffective assistance of trial counsel for failing to raise at trial an Eighth Amendment intellectual-disability claim under *Atkins v Virginia*, 536 U.S. 304 (2002), such that it will excuse the procedural default of the underlying *Atkins*-related trial counsel ineffective-assistance claim under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013); (2) whether Wesson's trial counsel rendered ineffective assistance for failing to raise an *Atkins* claim at trial under *Strickland v. Washington*, 466 U.S. 668 (1984), such that it will excuse the procedural default of Wesson's *Atkins* claim; (3) whether Wesson's *Atkins* claim has merit for purposes of establishing that Wesson was prejudiced by any ineffective assistance of post-conviction and trial counsel under *Strickland*; and (4) whether Wesson can prove by clear and convincing evidence that he is actually innocent of the death penalty under *Sawyer v. Whitley*, 505 U.S. 333 (1992), because he is intellectually disabled. The Court expects only the following witnesses to appear: (1) Wesson's initial state post-conviction counsel; (2) Wesson's trial counsel; (3) experts on intellectual disability; and (4) other witnesses the parties deem necessary to provide relevant and cogent testimony regarding the specific issues outlined above.

F.      **Conclusion**

121

Although Wesson presents substantial evidence that he may meet Ohio's current definition of intellectual disability, rendering him ineligible for the death penalty under *Atkins v. Virginia,* no court has yet heard his claim. And because neither his trial counsel nor his initial post-conviction counsel raised an *Atkins* claim in the state trial court, he faces significant hurdles before this Court can consider it. Wesson has demonstrated that "there are factual issues in dispute and an insufficient record upon which to resolve the legitimate claims [of ineffective assistance of counsel]" he advances to overcome the procedural bars to his *Atkins* claim. *Alcorn v. Smith*, 781 F.2d 58, 60 (6th Cir. 1986). This Court, therefore, will conduct an evidentiary hearing on those procedural issues. Wesson should be afforded an opportunity to prove his assertion that both his trial and post-conviction counsel failed in their duty to seriously consider, pursue and preserve a claim that, it appears, available evidence and case law should have suggested was at the very least credible and at best would spare their client a death sentence.

**IV.**     **Fifth Ground for Relief:** *Ineffective Assistance of Appellate Counsel*

For his fifth ground for relief, Wesson asserts that his appellate counsel on direct appeal provided ineffective assistance in failing to raise a claim of ineffective assistance of trial counsel based on their failure to present a defense of voluntary intoxication. (Doc. 46 at 145-49.) Wesson raised this claim in an application to reopen his direct appeal under Ohio Supreme Court Practice Rule 11.06, which the court summarily denied. (Doc. 12-8 at 322.) This claim is ripe for federal habeas review.

The Supreme Court has held that a defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Wesson must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

Appellants have no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Wesson argues that his appellate counsel should have raised a claim that his trial counsel were ineffective for failing to employ a defense of involuntary intoxication under the authority of the Ohio Supreme Court's decision in *State v. Mitts*, 81 Ohio St. 3d 223, 228 (Ohio 1998). (Doc. 46 at 148.) In that case, the court recognized that, although "'[t]he common law and statutory rule in American jurisprudence is that voluntary intoxication is not a defense to any crime[,]'" in Ohio, "'where specific intent is a necessary element, . . . if the intoxication was such as to preclude the formation of such intent, the fact of intoxication may be shown to negative this element.'" *Id*. at 228 (quoting *State v. Fox*, 68 Ohio St. 2d 53, 55 (Ohio 1981)). In October

2000, however, the Ohio state legislature amended the statute governing the requirements for criminal liability by adding a section that provides: "Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." Ohio Rev. Code § 2901.21(C)(1). After 2000, therefore, "a lack of capacity to form an intent to commit a crime due to self-induced intoxication [was] no longer available as an affirmative defense to a crime where a mental state is an element of the crime." *State v. Koballa*, No. 100664, 2014 WL 4101013, at *5 (Ohio Ct. App. Aug. 21, 2014).[17] Wesson's appellate counsel, therefore, were not ineffective for failing to raise a claim that was contrary to Ohio law.

Accordingly, Wesson has not established that the Ohio Supreme Court's decision rejecting this claim either contravened or misapplied *Strickland*.

## V.    Sixth Ground for Relief: *Constitutionality of the Death Penalty*

In his sixth ground for relief, Wesson launches a broad attack on the constitutionality of the death penalty, both on its face and as applied to him. He claims: (1) the death penalty violates the Eighth Amendment's ban against cruel and unusual punishments: (2) the death penalty is arbitrary and unreliable in violation of the Fourteenth Amendment rights to due process and equal protection; (3) Ohio's capital punishment statutory scheme induces ineffective assistance of counsel in violation of the Sixth Amendment rights to effective assistance of counsel and an impartial jury; (4) Ohio's capital punishment statutory scheme does not provide

---

[17] Moreover, even if Wesson were complaining here that appellate counsel should have raised a claim that trial counsel performed deficiently by failing to challenge Ohio Rev. Code § 2901.21(C) as unconstitutional, the claim still would lack merit. In 2004, the Ohio Supreme Court held that counsel's decision not to challenge the constitutionality of the statute in a capital case was a "legitimate tactical decision." *State v. Foust*, 105 Ohio St. 3d 137, 154 (Ohio 2004).

individualized sentencing in violation of the Fourteenth Amendment right to due process; (5) Ohio Revised Code § 2929.04(A)(7) is constitutionally invalid when used to aggravate Ohio Revised Code § 2903.01(B) aggravated murder; (6) Ohio Revised Code §§ 2929.03(D)(1) and 2929.04 are unconstitutionally vague; and (7) Ohio's capital punishment sentencing scheme does not permit a mercy option or an appropriateness determination. (Doc. 36 at 128-44.)

Respondent concedes that Wesson presented these claims on direct appeal to the Ohio Supreme Court, which rejected them on their merits, thereby preserving them for federal habeas review. (Doc. 43 at 71.) The state court opined:

> {¶ 90} In propositions X, XI, and XII, Wesson presents 12 constitutional challenges to Ohio's capital punishment scheme. We summarily reject these claims, as we have done in prior decisions. *See, e.g., Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 215–216; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 381–383; *State v. Carter*, 89 Ohio St.3d 593, 607–608, 734 N.E.2d 345 (2000). As we explained in *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus, "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution."

> {¶ 91} Wesson also argues that Ohio's death penalty statutes violate international law and treaties and therefore offend the Supremacy Clause of the U.S. Constitution. However, we have "rejected the argument that Ohio's death penalty statutes are in violation of treaties to which the United States is a signatory, and thus offend[ ] the Supremacy Clause of the United States Constitution." *State v. Bey*, 85 Ohio St.3d 487, 502, 709 N.E.2d 484 (1999).

> {¶ 92} These propositions of law are overruled.

*Wesson*, 137 Ohio St. 3d at 578.

This claim fails because Wesson has not, and cannot, show that the state court's decision is contrary to, or an unreasonable application of, "clearly established Federal law" under AEDPA's § 2254(d)(1). 28 U.S.C. § 2254(d)(1); *see also Wright v. Van Patten*, 552 U.S. 120,

125 (2008) (reversing grant of habeas relief because no Supreme Court decision had "squarely address[ed]" the issue presented or "clearly establish[ed]" law that applied to the facts of the case). The Supreme Court has declared that "it is settled that capital punishment is constitutional . . . ." *Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976). And the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death penalty scheme in particular, rejecting the very claims Wesson asserts here. *See, e.g., Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008)*; Buell v. Mitchell*, 274 F.3d 337, 367-76 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Jamison v. Collins*, 100 F. Supp. 2d 647, 759-67 (S.D. Ohio 2000)*.*

Accordingly, the Ohio Supreme Court's decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

### CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Wesson's grounds for relief. The Sixth Circuit has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this

Opinion, this Court now must consider whether to grant a COA as to any of the claims Wesson presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Id*. at 483. Thus, the Court determined,

[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id*. at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: Two (trial counsel ineffective-assistance / guilt phase, sub-claim regarding impeachment of Mary Varhola); Three (trial counsel ineffective-assistance / mitigation phase; sub-claims regarding prison records and expert, lay witnesses, Wayne Wesson's criminal record, and expert on link between Wesson's limitations and crimes); Five (appellate counsel ineffective-assistance); and Six (constitutionality of death penalty). No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief: Two (trial counsel ineffective-assistance / guilt phase, excluding sub-claim regarding impeachment of Mary Varhola); and Three (trial counsel ineffective-assistance / mitigation phase of trial; sub-claims regarding Wesson's efforts to redeem himself and FASD expert). These grounds are unequivocally procedurally defaulted.

The Court will issue a COA for the following grounds for relief: One (*Miranda* rights), as a reasonable jurist could debate the Court's conclusions regarding this claim.

For the foregoing reasons, this Court denies Wesson's Amended Petition for Writ of Habeas Corpus (Doc. 36) as to all grounds for relief with the exception of his fourth ground and the related claim of ineffective assistance of trial counsel under the third ground, which it reserves for judgment until such time that it conducts an evidentiary hearing on those claims as stated above. Wesson's Motion for Evidentiary Hearing (Doc. 47) is therefore granted as to those claims only and denied as to all other claims.

The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to Wesson's first ground for relief, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to that claim only. As to all remaining claims, the Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.


March 5, 2020                                    s/*Dan Aaron Polster*
Date                                             Dan Aaron Polster
                                                 United States District Judge